# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE APHRIA, INC. SECURITIES LITIGATION | Case No. 18 Civ. 11376 (GBD) |
|  | CLASS ACTION |
|  | AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
|  | DEMAND FOR JURY TRIAL |

Lead Plaintiff Shawn P. Cunix and Plaintiff Elizabeth Alexander ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things: a review of press releases and other public statements issued by Aphria Inc. ("Aphria"), Aphria's filings with the U.S. Securities and Exchange Commission ("SEC"), Aphria's and SOL Global Investments Corp. (formerly Scythian Biosciences Corp.) ("Scythian") filings on the System for Electronic Document Analysis and Retrieval ("SEDAR"); media and analyst reports about Aphria; review of information concerning the Canadian cannabis industry; and other information readily available on the internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities class action on behalf of all persons or entities that purchased or acquired Aphria securities between July 17, 2018 and April 12, 2019, inclusive (the "Class Period"), and were damaged thereby. The claims asserted herein are alleged against Aphria, Scythian, and certain of the companies' respective senior executives and/or directors and arise under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.      Aphria is a cannabis company that has been operating in Canada since 2014. According to its filings with the SEC, Aphria "drives value for shareholders through its international expansion" by "taking its experience and knowledge in the Canadian cannabis industry and applying it to newly federal legal markets." On July 17, 2018, supposedly in furtherance of this "international expansion" strategy, Aphria announced that it would be acquiring

a series of Latin American assets from Scythian, a company closely related to Aphria, for C$193 million. Unbeknownst to Plaintiffs and thousands of other Aphria shareholders, the acquisition was a sham. The assets being acquired—referred to herein as the "LATAM Assets"—were largely non-operational and in no way worth the amount Aphria ultimately paid. The entire acquisition was hatched by several Aphria insiders for the purpose of stealing money from Aphria in order to enrich themselves at the expense of ordinary shareholders. When proof of the fraud surfaced, Aphria's stock price plummeted and investors lost millions of dollars in the process. The stock price fell even further after the Aphria wrote down the value of the LATAM Assets by C$50 million in response to a request by the Ontario Securities Commission. This action seeks to recover the funds investors lost because of Defendants' illegal and reckless conduct.

3.      The LATAM Assets primarily consisted of businesses located in Jamaica, Argentina, and Colombia. The assets were:

- Marigold Acquisitions Inc. ("Marigold"), which owned a 49% stake in a business named Marigold Projects Jamaica Ltd. ("Marigold Projects") located in Jamaica;

- MMJ International Investments Inc. ("MMJ International"), which owned 100% of ABP, S.A. ("ABP") located in Argentina; and

- MMJ Colombia Partners Inc. ("MMJ Colombia"), which owned 90% of ColCanna SAS ("ColCanna") located in Colombia.

4.      Aphria insiders, namely Defendant Andrew DeFrancesco, owned these business before they were sold first to Scythian and then later to Aphria. DeFrancesco is one of Aphria's co-founders and has been a longtime strategic advisor to Aphria's CEO, Defendant Victor Neufeld. DeFrancesco is also one of Scythian's largest stockholders and, at all relevant times, served as a

director and/or senior officer of Scythian. Using his influence and control over Scythian and Aphria, DeFrancesco sold these assets to Scythian for an extreme profit. In turn, DeFrancesco caused Aphria to purchase them from Scythian for even more money with the assistance of Neufeld and other Aphria insiders. In furtherance of their scheme to defraud Aphria investors, DeFrancesco and the other Defendants took purposeful action to conceal their involvement in the transactions.

5.    DeFrancesco and the other Defendants also concealed from investors that these assets were largely non-operational and were not worth the C$193 million that Aphria agreed to pay for them. Although Aphria claimed that the LATAM Assets acquisition "[s]olidifie[d] Aphria's leadership position in the global cannabis industry" and "[p]rovided Aphria with world class assets in the most advanced regulatory jurisdictions across LATAM and Caribbean markets," evidence shows that the businesses were barely operational and in some cases not even licensed to do the business Aphria claimed.

6.    The entity in Jamaica, Marigold Projects, supposedly conducted operations out of its corporate office in Kingston, Jamaica, and three other locations in the country. Visits to each of these locations revealed something dramatically different than represented. The corporate office was in fact an abandoned building. The other locations were either non-existent, vacant properties, or nothing more than a small office used to receive mail.

7.    Likewise, the business in Argentina, ABP, was represented by Aphria to be a "strong retail platform" and "one of the nation's leading importers and distributors of pharmaceuticals." It was in fact nothing more than a small retail drugstore (like a Rite-Aid or CVS) and a warehouse that was nearly empty.

8.    ColCanna, the entity in Colombia, was also not what was represented. Far from being a licensed cannabis grower, the business did not have licenses it needed to grow marijuana

at the time of the acquisition. Moreover, the government of Colombia had not provided ColCanna with a "quota" for production, meaning that it was prohibited from growing any marijuana at any point before, during, or after the time of the acquisition.

9. On December 3, 2018, two independent and well-respected investment research firms, Hindenburg Research and Quintessential Capital Management, exposed the LATAM Assets as having virtually zero worth. In a report titled *Aphria: A Shell Game with a Cannabis Business on the Side* (the "Hindenburg Report"), the two firms provided conclusive proof that each LATAM Asset was not as Aphria represented. The report contained photographs of in-person site visits as well as excerpts of corporate records obtained from local authorities.

10. In response to the Hindenburg Report, investors sold their Aphria stock. From a closing price of $7.90 per share on November 30, 2018, Aphria's stock plummeted to $4.51 per share on December 4, 2018 on high volume representing a total market capitalization loss of more than $220 million.

11. The Hindenburg Report prompted a series of immediate and significant developments at Aphria. On December 6, 2018, Aphria's Board of Directors created a Special Committee to investigate whether any wrongdoing had occurred in connection with the LATAM Assets acquisition. On January 11, 2019, while the Special Committee was still investigating, Neufeld resigned as Aphria's CEO. On February 15, 2019, the Special Committee completed its review and, among other things, announced that several Aphria insiders had interests in the LATAM Assets transaction that should have been disclosed. The Special Committee also concluded that the amount paid for the LATAM Assets was excessive.

12. In response to the Special Committee's findings, the Ontario Securities Commission requested Aphria to conduct an impairment test on the LATAM Assets prior to its

next quarterly results. Aphria complied and, on April 15, 2019, the company wrote down the LATAM Assets by C$50 million.

13.     Without question, the impairment validated many if not all of the accusations asserted in the Hindenburg Report. Investors lost further trust with management and sold Aphria shares heavily again. From a closing price of $10.10 per share on April 12, 2019, Aphria's stock dropped to $8.60 per share the following trading day on April 15, 2019 amounting to an additional $97.5 million market capitalization loss.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Aphria's stock trades in this District on the NYSE.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

17.     Aphria and Scythian conduct substantial business and operations in the United States. At all relevant times, each company's securities traded on U.S.-based markets including over-the-counter exchanges as well as NYSE and NASDAQ. Additionally, both companies derive

substantial amounts of revenue, including investment income, from U.S.-based operations. Consequently, this Court has jurisdiction over Aphria, Scythian, and the Individual Defendants.

## PARTIES

### A.  Plaintiffs

18.     Lead Plaintiff Shawn P. Cunix purchased Aphria securities on the NYSE at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. A certification evidencing Mr. Cunix's transactions in Aphria is attached hereto and incorporated herein by reference as if fully set forth below.

19.     Plaintiff Elizabeth Alexander purchased Aphria securities on the NYSE at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. A certification evidencing Ms. Alexander's transactions in Aphria is attached hereto and incorporated herein by reference as if fully set forth below.

### B.  Defendants

20.     Defendant Aphria is a Canadian company operating within the cannabis industry. Its principal executive office is located at 265 Talbot Street West, Leamington, Ontario N8H 4H3, Canada. As of July 2018, the company's stock traded on the Toronto Stock Exchange ("TSX") under the ticker symbol "APH" and on the United States over-the-counter Venture Market exchange under the ticker symbol "APHQF". On November 2, 2018, its shares began trading on the New York Stock Exchange ("NYSE") under the symbol "APHA".

21.     Defendant Vic Neufeld was Aphria's President and CEO from June 2014 until March 1, 2019. He also served as Aphria's Chairman from June 2014 until December 26, 2018 when he was succeeded as Chairman by Irwin Simon. Neufeld resigned from Aphria on January 11, 2019 amidst an ongoing internal investigation into allegations of self-dealing and misconduct.

Neufeld also served as Scythian's Chairman of the Board of Directors from March 12, 2018 through April 24, 2018.

22.     Defendant Carl Merton has been Aphria's CFO since December 2015.

23.     Defendant Cole Cacciavillani co-founded Aphria and served as its Vice-President, Growing Operations during the Class Period until March 1, 2019. Cacciavillani also served as director on Aphria's Board from 2014 until March 1, 2019.

24.     Defendant John Cervini was another co-founder of Aphria. He served as the company's Vice-President, Infrastructure & Technology, until March 1, 2019. Cervini served as a director on Aphria's Board from 2014 until March 1, 2019.

25.     Andrew DeFrancesco and his private equity firm, the Delavaco Group, are integral to the fraudulent scheme alleged herein. In 2013, DeFrancesco became one of Aphria's first shareholders by investing C$6.2 million into Aphria. He then served as a strategic advisor to Neufeld, Cacciavillani, and Cervini. In 2014, DeFrancesco orchestrated the reverse merger that resulted in Aphria's shares being listed on the TSE and DeFrancesco owning 5.6% of the company's stock. DeFrancesco and the Delavaco Group have invested or advised on every Aphria equity financing since it went public.

26.     DeFrancesco has other business ties to Aphria and Neufeld. In May 2017, Aphria invested C$25 million into DFMMJ Investments, Ltd., a company founded by DeFrancesco and his private equity firm, Delvaco. Through a series of transactions, the investment ultimately led to a 37.6% ownership interest in Liberty Health Sciences Inc. ("Liberty"). Liberty produced and sold medical cannabis in the State of Florida through the Florida Department of Health. Aphria funds a portion of Liberty's operating costs. The company claims Liberty reimburses it for these costs. Other shareholders in Liberty include and/or included Neufeld, Cervini, and Merton.

7

27.     SOL Global Investments Corp. f/k/a Scythian Biosciences Corp. ("Scythian") is a Canadian company with its principal offices located at 200-366 Bay St., Toronto, ON, M5H 4B2, Canada. Scythian also maintains offices and business operations in Florida. Scythian operated as a mining exploration company until it divested its mining operations in January 2017. In August 2017, Scythian became a life sciences company with a focus on cannabis. Aphria and various insiders, including Neufeld, Caciavillani, and Cervini, owned approximately 10% of Scythian during the Class Period.

28.     DeFrancesco also has ties to Scythian. In addition to being integral in its reverse merger and listing on TSE, he joined Scythian's board of directors on September 4, 2018 and became Chairman on September 21, 2018. On November 1, 2018, DeFrancesco became Scythian's Chief Investment Officer. DeFrancesco's Delavaco Group maintains offices with Scythian in Florida.

29.     Defendants Neufeld, Merton, Cacciavillani, Cervini, and DeFrancesco are also collectively referred to hereinafter as the "Individual Defendants."

30.     Aphria, Scythian, and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.     Aphria's Acquisition of the LATAM Assets Was a Fraudulent Scheme Designed to Enrich Company Insiders at the Expense of Ordinary Aphria Shareholders.**

31.     Aphria is a cannabis company licensed to produce and sell medical cannabis in Canada. The company commenced operations in 2014 and, since then, has grown through a series of acquisitions both domestically and abroad.

32.     In its filings with the SEC, Aphria claimed to "drive value for shareholders through its international expansion" by "taking its experience and knowledge in the Canadian cannabis

industry and applying it to newly federal legal markets." As of May 31, 2018, Aphria claimed to have a presence in more than 10 countries across five continents.

33.     Aphria claimed to be continuing this trend when it announced its intention to purchase the LATAM Assets on July 17, 2018. In a press release, Aphria announced that it would be acquiring the LATAM Assets, *i.e.*, Marigold, ABP, and Colcanna. It claimed, among other things, that the transaction "[s]olidifie[d] Aphria's leadership position in the global cannabis industry" and "[p]rovided Aphria with world class assets in the most advanced regulatory jurisdictions across LATAM and Caribbean markets."

34.     At no point did Defendants disclose that the LATAM Assets were worth materially less than represented or that the transaction was designed to benefit DeFrancesco, Neufeld, and other Aphria insiders at the expense of ordinary Aphria shareholders. To the contrary, Defendants devised and orchestrated the purchase and sale of the LATAM Assets to Aphria through a series of transactions that were designed to hide or prevent the public from identifying the true owners of the companies.

35.     DeFrancesco and other Aphria insiders initially purchased the LATAM Assets for a fraction of what Aphria ultimately paid. They then sold them to Scythian and Scythian, in turn, then sold them to Aphria. Both DeFrancesco and Neufeld were directors and/or officers of Scythian and Aphria during this time and were therefore able to use their control over the respective companies to execute the various transactions.

**B.      DeFrancesco and Other Aphria Insiders Were the Initial Owners of the LATAM Assets.**

36.     The LATAM Assets consisted primarily of three separate entities: Marigold, MMJ International, and MMJ Colombia. DeFrancesco and other Aphria insiders were the initial owners of these entities.

###### i.     Marigold

37.     Scythian announced its intent to purchase Marigold on March 22, 2018. In a press release, Scythian explained that the acquisition would result in Scythian obtaining a 49% stake in Marigold Projects, a Jamaican company with conditional licenses to cultivate and sell cannabis products, as well as a royalty interest in products sold. As consideration for the stake, Scythian had agreed to pay approximately C$34.5 million in stock.

38.     Canadian corporate records show that Marigold underwent a corporate name change on March 19, 2018, just three days prior to the announcement. Marigold's previous corporate name was Delavaco Caribbean Ventures Inc. (and, before that, Delavaco Ventures Inc.). Below is an excerpt from British Colombia Registry Services showing the corporate name history of Marigold:



39.     Scythian timed its announcement of the Marigold acquisition so as to allow DeFrancesco and his private equity firm, Delavaco, to change the name of the Marigold entity from Delavaco Caribbean Ventures Inc. to Marigold in order to conceal his involvement.

### ii.    MMJ International

40.     On March 11, 2018, Scythian entered into a non-binding letter of intent with MMJ International to acquire all of the issued and outstanding common shares of MMJ International subject to, among other things, the completion of MMJ International's acquisition of ABP, a pharmacy company that engaged in the distribution of pharmaceuticals in Argentina. Scythian paid MMJ International C$27 million.

41.     MMJ International, like Marigold, was formerly owned by DeFrancesco and his private equity fund, Delavaco. Corporate records show that MMJ International's previous name was Delavaco MMJ International. An excerpt of these corporate records is below:



42.     As with Marigold, DeFrancesco changed the MMJ International entity's name just days before Scythian announced the acquisition from Delavaco MMJ International Inc. to MMJ International in order to conceal his ownership over the underlying asset.

### iii.     MMJ Colombia

43.     On April 8, 2018, Scythian entered into a binding letter of intent with MMJ Colombia and the sole shareholder of MMJ Colombia to acquire all of the issued and outstanding common shares of MMJ Colombia subject, to among other things, the completion of MMJ Colombia's acquisition of 90% of ColCanna.  Scythian paid MMJ Colombia C$39 million.

44.     Like Marigold and MMJ International, MMJ Colombia was also owned by DeFrancesco prior to its sale to Scythian. Corporate records show that MMJ Colombia's previous name was Delavaco Colombia Partners Inc. An excerpt of the corporate records showing the name change is below:



45.     DeFrancesco changed the name of the MMJ Colombia entity from Delavaco Colombia Partners Inc. to MMJ Colombia in order to conceal his ownership of the underlying assets, *i.e.*, ColCanna SAS.

**C.**   **Marigold Projects Either Did Not Exist or Was Not Operational When Aphria Bought It From Scythian.**

46.   When Aphria purchased Marigold from Scythian for C$145 million, Marigold Projects either did not exist or was not operational. First, Marigold Projects maintained an office at 28 Lancaster Road in Kingston, Jamaica, according to Jamaican corporate records. An excerpt of these corporate records is below:



47.   Photographs of Marigold Projects' office, taken in September 2018, show that it was abandoned without any sign of operations or business. These photographs are below:








48.     Additional investigation since September 2018 confirms that Marigold Projects had

no business operations at its registered office. As of May 24, 2019, the building was empty and/or

under repair and not occupied by Aphria. According to interviews with neighboring tenants, the

only tenants to have occupied the building in the past year and a half was a coffee establishment

on the ground floor which specialized in the packaging of roasted coffee and residential tenants on

the upper floor. The coffee establishment ceased operations approximately one and a half years ago and the residential tenants vacated the building approximately eight months ago.

49.     Pictures of 28 Lancaster Road taken on or around May 24, 2019 are below:









50.     While corporate records showed that Marigold Projects had other business locations, these locations either did not exist or were confirmed in person not to be operational. Specifically, Marigold Projects' office at 38a Trafalgar Road in Kingston, Jamaica, was supposedly in Suite 51; however, Suite 51 did not exist in the building.

51.     Subsequent investigation performed on or around May 24, 2019 confirms that Marigold Projects maintained no operations at 38a Trafalgar Road at the time Aphria acquired it. The only evidence of any cannabis-related company currently operating on the premises was a sign marked "Sensi Medical Cannabis Home" which, according to interviews with neighboring tenants, has occupied Unit 50 for the past eight (8) months although non-operational during this time. Prior to "Sensi Medical Cannabis Home," the unit was unoccupied for over a year. "Sensi Medical Cannabis Home" is supposed to open in June 2019.

52.     Marigold Projects supposedly maintained another office at 22 Trafalgar Road in Kingston, Jamaica, at the time of Aphria's acquisition. However, investigation performed in October 2018 showed that the office largely vacant and non-operational. What was described as a "world class asset" appeared to be nothing more than a small office with a paper sign on the front door. Moreover, neighboring tenants claimed that the owners of the business rarely visited. Photographs taken in October 2018 of the premises at 22 Trafalgar Road are below:





53.     More recent investigation conducted on or around May 24, 2019 confirms that the operations at 22 Trafalgar Road are substantially similar in nature and have not significantly improved. The building is two stories and houses several offices, including parking areas for each unit. On two different occasions, the parking area for Unit 6 was empty. Inside, Unit 6 presented a sign "Marigold Unit 6" written on a glass door. Only one person was present in the office on the first visit. During the second visit, the door was closed and the lights were off in the office. A photograph taken on or around May 24, 2019 of the door to Unit 6 is below:



54.     Marigold Projects was also supposed to own and/or lease land at Volume 1388 Folio 682, Lot 6, Bernard Lodge, Block A, Saint Catherine, Jamaica. This area is within a small community known as "Silverstone." Silverstone is a residential community surrounded by commercial entities. No marijuana cultivation occurs in this area and "Block A" was not found to exist during investigation performed at the time of the investigation or more recently on or around May 24, 2019.

55.     Corporate records for Marigold Projects also listed the entity's founding directors. One of the directors, Dr. Janis Simmonds-Fisher, denied having anything to do with Marigold Projects when interviewed. Dr. Simmonds-Fisher signed a document to this effect which is excerpted below:



56.     According to Aphria, Marigold Projects also held various licenses to cultivate and grow cannabis. These licenses, however, were not yet obtained. An article in *The Gleaner* dated October 24, 2018, reported Marigold Projects' managing director, Lloyd Tomlinson, admitting that the entity had only "conditional approval for several licenses" and that growing operations had not yet commenced.

57.     Marigold Projects had no substantive operations at the time of the LATAM Assets acquisition or, for that matter, when Scythian bought it from Delavaco on March 22, 2018. Notwithstanding, Aphria purchased Marigold Projects from Scythian for C$145 million.

**D.   MMJ International, Like Marigold, Was Also Substantially Worthless and Non-Operational at the Time of the Acquisition.**

58.     ABP, also like Marigold Projects, was not as represented. Far from being a "strong retail platform" and "one of the nation's leading importers and distributors of pharmaceuticals," the entity consisted of a pharmacy and a warehouse. Additionally, reports pertaining to an interview with an employee of ABP claimed that the entity's revenue for 2017 was only US$430,000 and not US$11 million, as claimed in a press releases from Scythian and/or Aphria.

21

59.     An inspection of ABP's pharmacy and warehouse confirmed that the entity's operations were much smaller and worth less than claimed by Aphria. The pharmacy was an ordinary drugstore, similar to a CVS or Rite-Aid. Photographs of the pharmacy, taken in October 2018 (left) and May 2019 (right), are featured below:

 

60.     This retail location has not changed in any substantial way since October 2018. It serves as a retail drug store and not a nationwide distributor of Aphria products.

61.     The warehouse purportedly owned by ABP was also not as represented. Photographs of the warehouse show that it was not operational and is not an active "distribution centre." The photographs below, taken in October 2018, feature ABP's warehouse:

 

62.     An inspection of ABP's warehouse performed in May 2019 provided no evidence that the building serves as a warehouse or that it services Aphria's operations. To the contrary, the building comprises three stories and is approximately 300 square meters in size. Photographs of the premises show little activity and/or branding:





63.     During the sale and purchase of MMJ International (including ABP) from Scythian to Aphria, Scythian announced that ABP had purchased product from Aphria for educational use by the Garrahan Hospital, described by Scythian as a "World Renowned Pediatric Hospital for Research and Education." According to an interview with Garrahan Hospital staff, the "purchase" was in fact a "donation" made by Aphria to the hospital. This was confirmed by Garrahan Hospital in a press release on October 31, 2018.

64. MMJ International's operations or, for that matter, ABP's operations were not as mature or valuable as represented by Aphria to investors. Notwithstanding, Aphria bought it from Scythian for C$50 million.

**E.** **MMJ Colombia Was Virtually Worthless When Acquired by Aphria.**

65. ColCanna, like the other LATAM Assets, were materially different than represented. Significantly, corporate revenue records confirmed that the entity was established on December 27, 2017, and thus only six months old when purchased by Scythian. Moreover, the entity reported zero operating activity and assets totaling approximately US$16,000. An excerpt of these corporate records is below:



66. The amounts on the left feature ColCanna's assets, which in U.S. dollars equals approximately $16,000. The amounts on the right reflect ColCanna's operating results, which show zero activity.

67. In terms of its physical operations, ColCanna maintained an office in Manizales, Colombia. Photographs of the office show a staff of approximately five people. These photographs are featured below:



68.     While Aphria claimed ColCanna's value was attributable to its greenhouse facilities, photographs from ColCanna's website that were available at the time of the acquisition showed that the greenhouses were not yet operational. These photographs are featured below:



69.     Research into ColCanna also confirmed that it was not even licensed to produce cannabis at the time it was acquired by Scythian or when it was resold to Aphria. Copies of the cultivation licenses granted to ColCanna show that they were first applied for on February 16,

2018 and not approved until July 6, 2018. According to the Colombian Agriculture Institute, ColCanna was not granted authorization as a "selected seed producer for psychoactive cannabis and hemp" until October 30, 2018. Moreover, while ColCanna purportedly owned a 10-hectare plot of land in Chinchina, Caldas, corporate documents filed with the Caldas Chamber of Commerce make no reference to it. Accordingly, when Scythian signed its letter of intent with MMJ Colombia, ColCanna did not have any cannabis licenses or land to use for cultivation.

70.    Even if ColCanna had the licenses and owned land that Scythian and Aphria claimed, the value of MMJ Colombia was drastically lower than represented. The cost of the licenses applied for by ColCanna was approximately US$21,000. In addition, once receiving the licenses, cannabis growers are required to apply for and receive a "quota" in order to produce cannabis pursuant to Decree 613 of 2017. Quotas must be applied for by April 30 and, if granted, will apply for the following calendar year. ColCanna did not apply for and did not have a "quota" for 2019. In other words, ColCanna was not permitted to cultivate cannabis in 2019.

71.    The value of land in Chinchina, Caldas, is also relatively inexpensive. Property records show that land with mature, productive coffee and fruit plantations sell for approximately US$12,000 per hectare to US$23,000 per hectare, including well-tended and productive plantations, buildings, estate houses, and multiple natural water sources. Given that ColCanna's property appeared to have neither productive crops nor viable buildings in place would mean that its 10 hectare plot was worth significantly less than US$120,000.

72.    Notwithstanding ColCanna's apparent lack of operations, Aphria paid C$84 million to Scythian for a controlling stake in the entity.

F.   **Hindenburg Publishes the Report about the LATAM Assets.**

73.    Hindenburg is an entity that specializes in forensic research. Nate Anderson is the founder of Hindenburg Research. Anderson is both a certified financial analyst and a Chartered Alternative Investment Analyst. Anderson performed a substantial amount of the work in the report concerning Aphria's LATAM Asset acquisition. Prior to the filing of this complaint, Anderson confirmed the contents of the Hindenburg Report.

74.    QCM is New York-based asset management firm aiming for exceptional returns through the application of value investing, shareholder activism and deep due diligence. QCM has a track record of credibly identifying, investigating, and reporting fraudulent actions by public companies. Gabriel Grego is the founder of QCM. QCM co-authored the Hindenburg Report.

75.    Before the market opened on December 3, 2018, Hindenburg along with QCM issued the Hindenburg Report. The Hindenburg Report detailed suspected fraud by Aphria and executives after conducting a significant and substantial investigation concerning the LATAM Assets, specifically found undisclosed conflicts of interest, undisclosed related-party transactions, and concluded that Aphria and certain of its executives have been misrepresenting the value of the LATAM Assets so as to benefit unnamed insiders.

76.    Along with the Hindenburg Report, Gabriel Grego and Nate Anderson made a presentation concerning the findings of the Hindenburg Report at the Kase Learning Shorting Conference also on December 3, 2018. In support of his over 37 minute presentation, QCM and Hindenburg prepared 126 slides that provided additional details concerning the research and findings of the Hindenburg Report (the oral presentation and slides, collectively the "QCM Presentation").

77.    The Hindenburg Report laid out the involvement of DeFrancesco, the companies he used to purchase the LATAM Assets before selling them to Scythian, and the flow of money

28

between these entities in a scheme to defraud Aphria's investors to benefit Scythian, undisclosed insiders, and DeFrancesco. The Hindenburg Report aptly summarizes graphically the interplay of the various entities and transfers of value between DeFrancesco's entities, Scythian, and Aphria as previously discussed above:



78.     The Hindenburg Report and QCM Presentation revealed that:

(a)     The companies that originally acquired the LATAM Assets were set up and/or acquired by DeFrancesco;

(b)     DeFrancesco changed the names of these entities to hide his involvement;

(c)     DeFrancesco and other Aphria insiders made efforts to conceal their ownership and control of the underlying LATAM Assets;

(d)     Scythian purchased the underlying LATAM Assets at the direction of Neufeld as Scythain's Chairman;

(e)     Scythian sold the LATAM Assets to Aphria for a significant profit;

(f)     Aphria insiders had undisclosed conflicts of interest in the transaction; and

(g)     DeFrancesco and other Aphria insiders received cash and/or Scythian shares.

79.     These revelations disclosed that: (i) Defendants omitted to disclose material information that the non-independent directors of the Board, namely Neufeld, Cacciavillani, and Cervini had undisclosed conflicts of interest in the transaction; (ii) the represented value of the LATAM Assets was not commensurate to the substantial consideration paid by Aphria for LATAM Holdings; (iii) Defendants omitted material information that DeFrancesco along with other Aphria insiders obtained an undisclosed windfall in the form of an indirect distribution of Aphria shares; (iv) Aphria insiders Neufeld, Cacciavillani and Cervini  and DeFrancesco were engaged in a scheme to defraud Aphria investors in the transaction; and  (v) during the Class Period, Aphria did not have disclosure controls and procedures that was properly designed and operating effectively so as to provide reasonable assurance that disclosure of material information relating to Aphria was made.

80.     Although the authors of the Hindenburg Report and the QCM Presentation disclosed that they possessed a short interest in Aphria stock, the sharp and substantial decline in the price of Aphria shares demonstrates that the market's assessment of the credibility of the Hindenburg Report's and QCM Presentation's detailed and corroborated findings and allegations of wrongdoing by Defendants.

81.     The credibility and seriousness of the allegations raised by the Hindenburg Report and QCM Presentation was also accepted and incorporated by numerous equity analysts that

follow Aphria downgraded the stock and/or slashed or removed price targets, including Eight Capital, BMO Capital Markets and GMP Securities, further demonstrating the credibility of the Report.

82.     On December 3, 2018, *Barrons.com* also published an article (which it updated the following day on December 4, 2018), titled *Marijuana Stock Aphria Is Falling Again as It Fights a Short Seller Who Called Out 'Something Very Sinister'*, where DeFrancesco confirmed in an interview that "he had assembled the overseas assets that Aphria bought, but noted that the deals had passed fairness valuations by lawyers and investment bankers."

83.     On December 3 and December 4, 2018, Aphria issued statements denying the findings contained in the Hindenburg Report. Aphria's response, however, failed to substantively address many of the issues of malfeasance and self-dealing that the Hindenburg Report raised.

84.     On December 3, 2018, during market hours, Aphria issued a press release, also filed as an exhibit to a Form 6-K, stating it was aware of the publication of the Hindenburg Report and confirming that Aphria's board of directors "received financial advice and a fairness opinion from a reputable firm that the consideration to be offered by Aphria in respect of the transaction was fair, from a financial point of view, to Aphria and its shareholders" (the "December 3, 2018 Aphria Response Press Release"). The Form 6-K was signed by Merton.

85.     The December 3, 2018 Aphria Response Press Release stated in relevant part:

**Aphria statement regarding short-seller report**

LEAMINGTON, ON, Dec. 3, 2018 /CNW/ - Aphria Inc. ("Aphria" or the "Company") (TSX: APHA and NYSE: APHA) is aware of a short-seller report released earlier today which Aphria believes is a malicious and self-serving attempt to profit by manipulating Aphria's stock price at the expense of Aphria's shareholders.

Investors should exercise caution in relying on the misrepresentations and distortions contained in the report and recognize that, by their own admission,

Hindenburg Research"…stands to realize significant gains in the event that the price of any stock covered herein declines." The report also states that, "Hindenburg Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of [the information in report]."

The report makes reference to the Company's LATAM acquisition which closed on September 27, 2018.  In connection with this transaction, the Board of Directors of Aphria confirmed that it received financial advice and a fairness opinion from a reputable firm that the consideration to be offered by Aphria in respect of the transaction was fair, from a financial point of view, to Aphria and its shareholders.

86.     On December 4, 2018 before the market opened, Aphria issued a press release, also filed as an exhibit to a Form 6-K, in response to the Hindenburg Report (the "December 4, 2018 Aphria Response Press Release") that provided a list of reasons as to why "Aphria Unequivocally Stands Behind its LATAM Operations." Notably, the press release also quoted Neufeld concerning insiders purchases of Aphria shares of C\$3.1 million on the same day at which Aphria stock price reached its then lowest close in the U.S. markets.  The Form 6-K was signed by Merton.

87.     In response, on December 4, 2018 at approximately 9:15 a.m., Hindenburg issued a response to Aphria's denials of wrongdoing (the "December 4, 2018 Hindenburg Response"). The December 4, 2018 Hindenburg Response stated in pertinent part:

This morning, Aphria <u>responded</u> to our report detailing believed undisclosed conflicts of interest and signs of worthlessness relating to its LatAm transactions. The company's response largely reiterated its earlier press releases touting the supposed worth of its acquisitions and did nothing to dispute our core findings.

We believe it is of utmost importance to note what the company did NOT say in response to our reporting:

1.   We alleged that the company acquired its supposed assets through a series of shell companies established by a key Aphria/Scythian insider and deal partner Andy DeFrancesco.

The company did not dispute the structure of these transactions.

2.   We alleged that the official registered office of Aphria's Jamaica subsidiary is an abandoned building that was sold off by the bank earlier this year.

32

The company's response: **none**.

3. We alleged that Aphria's Jamaica subsidiary leased "unit 51" of a building complex that only goes up to "unit 50". In other words, "unit 51" didn't exist.

The company's response: **none**.

4. We alleged that after 6 months, the company's office lease in Jamaica had a paper sign on its door and showed virtually zero signs of activity.

The company's response: **none**.

5. We alleged that a purported director of Aphria's Jamaica subsidiary denied IN WRITING that she had ever served as a director at the company.

The company's response: **none**.

6. We alleged that other supposed directors and supposed top scientists associated with Aphria's Jamaica subsidiary appeared to either not exist or had no/limited online presence.

The company's response: **none**.

7. We alleged that the company's much-touted cannabis licenses in Jamaica cost only about $500 to acquire and require minimal effort.

The company's response: **none**.

8. We alleged that individuals associated with key insider/deal partner Andy DeFrancesco purchased shares in the Jamaican entity for only US $118 (*not* millions) and flipped them months later for C$18 million.

The company's response: **none**.

9. We alleged that an employee of the company's Argentine subsidiary stated that annual revenues were US$430 thousand, which directly contradicted press releases that annual revenues at the subsidiary were US$ 11 million.

The company's response: **none**. We urge the company to release the **audited financials** for this entity.

10. We alleged that the company's supposed major "purchase order" with a local Argentine hospital was actually a donation.

The company's response: **none**.

11. We alleged that the company's Colombian subsidiary was a newly-formed operation with exactly zero operating activity as of end of the year.

The company's response: **none**.

12. We alleged that the company's supposed "strong" retail presence in Argentina consisted of exactly one tiny pharmacy.

The company's response: **none**.

13. We alleged that on current Scythian Chairman Andy DeFrancesco's private Instagram account we saw his bragging about purchasing the very pharmacy into his own private equity firm one week before flipping the Argentine entity to Scythian for C$27 million (and hashtagging #GreedIsGood)



The company's response: **none**.

14. We alleged that the company's supposed distribution business in Argentina consists of an empty, unfinished warehouse.

The company's response: **none**.

15. We alleged that Andy DeFrancesco has a deep longstanding ties to both Aphria & Scythian. In regard to Scythian, the company until recently listed its head office at the same address and suite number of the Toronto office of DeFrancesco's private equity firm, the Delavaco Group. Scythian's CFO until late September was Jonathan Held, who operates his consulting firm

out of the <u>exact same address</u> and suite number as the Delavaco Group's Toronto office. Delavaco's COO was the "<u>finder</u>" of Scythian's reverse-merger deal to take the company public. Delavaco participated in Scythian's bought deals. DeFrancesco <u>was named</u> Scythian's Chairman of the Board and Chief Investment Officer on the EXACT SAME DAY the company closed on its acquisition of the Argentine entity.

The company's response: technically DeFrancesco wasn't an insider.

16. We alleged that Canadian regulators said Andy DeFrancesco has "little regard for the truth" and was involved in a forgery scheme. We alleged that DeFrancesco had business ties with multiple individuals the SEC has alleged to have committed securities fraud including Barry Honig, John Stetson, and John O'Rourke.

DeFrancesco's response, <u>per Barron's</u>: "Guys who put companies together come across each other and co-invest"

17. We allege that the company did not have all its required licenses in Colombia needed for cultivation.

The company's response: **Admits.** The company was granted a characterization permit "allowing the company to assess seeds and initiated a pilot test of its strains **prior to full scale cultivation**."

All told, we find the company's response to be supremely underwhelming. We note with some amusement the following line from the response:

> *"Since closing this important strategic acquisition in September, we have made considerable progress supporting and building out our operations on the ground in Latin America and the Caribbean."*

Typically, when a company makes an acquisition for C$280 million it purchase assets that already exist, not ones that need to be built out later. Note that our on-the-ground visits were recent, ranging from September to November of this year.

We demand that the company actually respond to our research and allegations. In addition, we demand the following information from the company:

- Who are ALL of the shareholders of the acquired shell companies? In filings with the Canadian Stock Exchange the company REDACTED names of the beneficiaries of these deals. (<u>1</u>, <u>2</u>)

- Did the beneficiaries of these shell deals include Aphria insiders, their spouses, family members, or other deal partners?

- We do not place any value in the 'fairness opinion' that Aphria bought to
  justify this transaction. We note that the bank that issued the opinion,
  Cormark Securities, has been an underwriter in Aphria's <u>dilutive</u> <u>bought-
  deal</u> financings and was the same bank that provided a 'fairness opinion'
  for Aphria's Nuuvera transaction. Recall that we had also identified signs
  of worthlessness and undisclosed related-party dealings relating to the
  Nuuvera transaction in <u>our earlier reporting</u>. Nonetheless, the company
  should release this document and make it available for public scrutiny.

Shareholders deserve FULL TRANSPARENCY on these issues and we will
continue to report on this subject until they receive it.

88.     Also, around 11:36 a.m. on December 4, 2018, QCM issued its own response to

Aphria's denials of wrongdoing (the "December 4, 2018 QCM Response"). The December 4, 2018

QCM Response stated in pertinent part:

**RESPONSE TO APHRIA PRESS RELEASE DATED DECEMBER 4, 2018**

December 4, 2018

After a careful review of Aphria's latest press release, we feel even more confident
in our thesis. Aphria has merely repackaged the main contents of its past public
statements, whilst conveniently avoiding addressing almost all of our very serious
core allegations. Our comments on selected points are below:

1. On "good corporate governance and transparency": the facts highlighted so
   far indicate that these have been seriously lacking, in our opinion.

2. On Aphria/Sol not being "sister companies": considering the presence of
   cross-over executives who had served on both companies' boards (e.g. Vic
   Neufeld), and the fact that both companies were taken public in similar
   circumstances, we believe that the press has been justified in using the term
   "sisters" when speaking about Scythian and Aphria.

3. On receiving a "fairness of opinion" on the LatAm transaction from
   Cormark: we challenge the company to release to the public the fairness
   opinion in its full form, without redactions. We have reviewed a fairness
   opinion issued by "Haywood", a Scythian advisor, and found it to be
   questionable. It is our understanding, the value of the assets acquired in the
   Latam transactions are based primarily on projected revenue figures that
   have been redacted and are therefore impossible to evaluate. We note that
   Cormark has acted as an underwriter for Aphria's secondary offerings.

4. On paying a "purchase price […] comparable with similar Latin America

36

acquisitions": in our presentation, we listed comparable transactions for each deal included in the LatAm transaction. We invite readers to refer to slides 57, 76 and 103 for an objective comparable analysis.

5. On disclosing the presence of insiders as beneficiaries of the transaction: the key issue is the possible presence of people with influence at Aphria in the shell companies used to acquire the LatAm assets, namely Marigold Acquisitions, MMJ International, and MMJ Colombia. The company should come forward and clarify both the identities of the beneficial owners involved as well as the price paid for the original assets.

What is more important is what the company did not say in its press release, for example:

1. Why did the Delavaco shells change name immediately before being sold, presumably at a large mark up, to Scythian?

2. Why did Scythian declare ABP's turnover to be equal to US$11m when the actual figure appears to be less than $500k?

3. Why was the agreement with the Garrahan hospital touted as a "purchase order" when the Garrahan described it as an expensive, long term donation?

4. Why is Marigold's registered address located in a derelict building?

89.     On December 4, 2018, Canaccord Genuity issued an analyst report entitled *Despite increased risk, fundamental value remains* concerning the Hindenburg Report, the December 3, 2018 Aphria Response Press Release, and the December 4, 2018 Aphria Response Press Release. Canaccord's report highlighted that Aphria's December 4, 2018 Aphria Response Press Release caused Canaccord to "revise[] our valuation to incorporate increased uncertainty due to this report." Moreover, it noted that Aphria "categorically denied" the insider dealings to Canaccord and that they "have no way to assess the validity of the claims[.]" In relevant part, Canaccord analyst report stated:

**Despite increased risk, fundamental value remains**

Hindenburg published a short-selling report that raised concerns about: (1) the underlying fundamental value of Aphria's Latin America assets (LATAM); and (2) allegations that insiders of the company may have had undisclosed financial

interests in these assets prior to being acquired. As a result, the company has seen its share price decline ~40% since last week's close. ***Earlier today, Aphria provided an update/overview of its LATAM business and we have revised our valuation to incorporate increased uncertainty due to this report***.

*     *     *

**Insider dealing assertions**

The report also alleges that Aphria Insiders held undisclosed economic interests in financing vehicles prior to being acquired. ***The company has categorically denied these allegations to us***. While we have no way to assess the validity of the claims, even after discounting our valuation to reflect higher risk, we still see good value at current levels.

Emphasis added.

90.    In response, GMP Securities and Bank of Nova Scotia analysts changed their ratings for Aphria to "under review." Canaccord Genuity, meanwhile, reiterated its "speculative buy" rating and lowered its price target to $18 from $24.50. BNN Bloomberg published an article, tilted *Aphria analysts scrambling in wake of short-seller report*, stating that "[a]nalysts are raising concerns on Aphria Inc. (APHA.TO) (APHA.N) amid a 30 per cent plunge in its shares in the past two days, following a short-seller report regarding the Canadian pot producer's transactions in Latin America." The article further reported that:

GMP Securities and Bank of Nova Scotia analysts have placed their ratings of Leamington, Ont.-based Aphria "under review," while the Bank of Montreal revised its price target of the company's stock to $9 from $22 after the short-seller report was released Monday. Canaccord Genuity also lowered its price target on Aphria's shares to $18 from $24.50 while reiterating its "speculative buy" rating on its stock.

***"We believe that management's credibility may have been impacted by the allegations raised in this report. It is unclear at this point how the company will re-establish trust with investors,"*** GMP analyst Martin Landry wrote in a note to clients.

. . .

Previously, GMP had a $22 price target with a "buy" rating on Aphria's shares, while Scotiabank rated the company as "sector outperform" with a $25 target. BMO

rated Aphria as "market perform" with a $22 price target prior to its revision late Monday.

Scotiabank analyst Oliver Rowe, who also placed his rating on Aphria under review, said the report *"raises too many questions and concerns for us to remain comfortable taking an investment view on the company."*

In a report, BMO analysts Tamy Chen and Peter Sklar noted *that there is likely heightened investor concern surrounding Aphria's acquisitions due to the company's previous purchase of Nuuvera in March for $450 million. The deal faced scrutiny after it was revealed that a number of senior officers and directors of Aphria were also shareholders of Nuuvera.*

Emphasis added.

91.     On December 5, 2018, Eight Capital, an analyst firm with no involvement or self-interest in the Transaction reputational or otherwise, issued an analyst report entitled *Short Report Concerns Partially Offset By Domestic Ops* that downgraded its rating on Aphria from a "Buy" to a "Neutral" rating and revising its target price from C$22.00 to C$7.00. In relevant part, Eight Capital's report stated:

In light of the uncertainty surrounding allegations in a recent short report targeting the Company's international assets, we are reducing our rating on APHA to Neutral from Buy and revising our target price to $7.00 (from $22).

. . .

**Our Neutral rating reflects our view that:**

- Despite characterizing the short report as "malicious" and reiterating the strategic value of its international asset portfolio, we feel that APHA's management team will need to make significant strides in order to rebuild trust and investor confidence in the market. We are awaiting a comprehensive response by APHA with respect to the various allegations. We remain uncertain with respect to the potential for future legal and regulatory repercussions as well as the potential for impacts to APHA's key stakeholder relationships both domestically and internationally.

92.     On December 6, 2018 before the market opened, Aphria issued a press release, also filed as an exhibit to a Form 6-K, in response to the Hindenburg Report (the "December 6, 2018

Aphria Response Press Release"). The Form 6-K was signed by Merton. In pertinent part, the press release stated that Aphria's was creating a Special Committee to review the allegations contained in the Hindenburg Report and determine if any wrongdoing had occurred.

93.     On December 8, 2018, the *Windsor Star* published an article titled *Aphria says it will provide line-by-line rebuttal to short seller allegations* that quotes Neufeld that Aphria was going to provide a rebuttal "line-by-line, point-by-point with pictures — real pictures, truthful pictures — on what we have called LATAM asset acquisition" to the Hindenburg Report. Aphria's "line-by-line," however, never came.

## G.     Neufield Leaves Aphria Amidst Evidence of Scandal

94.     On December 27, 2018 after the market closed, Aphria issued a press release, also filed as an exhibit to a Form 6-K, announcing that it was immediately appointing Irwin Simon as the Independent Chair of Aphria's Board of directors to replace Neufeld as the Chairman (the "December 27, 2018 Press Release"). The press release was also careful to state that Neufeld would remain as a director and as the CEO of Aphria while self-interestedly stressing that this action was to advance "the Company's governance best practices."

95.     On January 11, 2019 before the market opened, Aphria issued a press release, also filed as an exhibit to a Form 6-K, announcing that Neufeld and Cacciavillani each individually decided to "transition" from their executive roles, but they would remain on Aphria's board as directors.

96.     Before the market opened on February 15, 2019, Aphria issued a press release, also filed as an exhibit to a Form 6-K, announcing the conclusion of the Special Committee's review of the LATAM acquisition (the "February 15, 2019 Special Committee Press Release"). The

February 15, 2019 Special Committee Press Release, however, did not contain the promised line-by-line refutation of the Hindenburg Report.

97.     As to the LATAM assets, the February 15, 2019 Special Committee Press Release stated that the Special Committee found that the "consideration paid for the assets purchased in the Acquisition was determined to be within an acceptable range as compared to similar acquisitions by competitors, ***be it near the top of the range of observable valuation metrics***.  In the normal course of business and on an annual basis, consistent with the requirements under International Financial Reporting Standards, the Company will assess the carrying value of the acquired assets." Emphasis added.

98.     Notably, the February 15, 2019 Special Committee Press Release further announced "certain of the non-independent directors of the Company had conflicting interests in the Acquisition that were not fully disclosed to the Board." The individuals with "conflicting interests" were Neufeld, Cacciavillani, and Cervini.

**H.      Aphria Impairs LATAM Assets by $50 Million**

99.     In Canada, issuers may be selected for a Continuous Disclosure review (full or issue-oriented review (IOR)) after being identified using a risk-based and outcomes-focused approach using both qualitative and quantitative criteria. IORs may be based on a specific accounting, legal or regulatory issue, an emerging issue or industry, implementation of recent rules or on matters where we believe there may be a heightened risk of investor harm. A review may also stem from general monitoring of our issuers through news releases, media articles, complaints and other sources.

100.     In response to the news disclosed by the Special Committee, including that Aphria was only planning to assess the carrying value of the LATAM Assets "in the normal course of

business and on an annual basis" the Ontario Securities Commission requested Aphria perform an impairment test on its LATAM assets after the filing of the 2Q2019 Financial Statements on January 11, 2019.

101.    Before the market opened on April 15, 2019, Aphria issued a press release and also filed this press release on a Form 6-K with the SEC that announced Aphria's third quarter 2019 fiscal results for the period ended February 28, 2019 (the "April 15, 2019 Press Release"). The April 15, 2019 Press Release announced to the market that Aphria was taking a C$50,000,000 impairment charge on the LATAM Assets as a result of the impairment test they conducted at the behest of the OSC. The April 15, 2019 Press Release stated in relevant part:

**Non-Cash Impairment Charge on LATAM Assets**

The Ontario Securities Commission requested as part of a continuous disclosure review that the Company perform an impairment test on its LATAM assets subsequent to the filing of the 2019 second quarter financial statements. As a result of this impairment test conducted by the Company, the Company determined that a $50 million non-cash impairment charge to the carrying value of the LATAM assets was required.  The basis for this impairment arises from the Company's reassessment of the discount rate and the financial forecasts for these entities as a result of new financial information received from the financial advisors to the Special Committee who reviewed the LATAM transaction.  This new financial information consisted of lower gross margins and EBITDA margins used by the financial advisor for the Special Committee and recent financial information from the LATAM entities that showed higher than expected expenses. As a result of this new information, Aphria determined that the discount rate should be adjusted which resulted in the non-cash impairment charge to the carrying value of the LATAM assets.

102.    On April 15, 2019, Aphria also filed a Form 6-K (the "3Q2019 Form 6-K") with the SEC that included as Exhibit 99.1 its financial statements for the third fiscal quarter ended February 28, 2019 ("3Q2019 Financial Statements") and as Exhibit 99.2 Management's Discussion & Analysis for the quarter ("3Q2019 MD&A").

103.   The 3Q2019 Financial Statements included a table summarizing the fair value of the assets acquired and the liabilities assumed in connection with the LATAM Assets acquisition:

| | Note | Number of shares | Share price | Amount |
|---|---|---|---|---|
| **Consideration paid** | | | | |
| Shares issued | (i) | 15,678,310 | $ 17.47 | $ 273,900 |
| **Total consideration paid** | | | | **$ 273,900** |
| | | | | |
| **Net assets acquired** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | | | | 2,704 |
| Accounts receivable | | | | 571 |
| Other current assets | | | | 106 |
| Inventory | | | | 65 |
| Long-term assets | | | | |
| Capital assets | | | | 494 |
| Licences, permits & applications | | | | 123,956 |
| Goodwill | | | | 189,188 |
| **Total assets** | | | | **317,084** |
| Current liabilities | | | | |
| Accounts payable and accrued liabilities | | | | 1,986 |
| Income taxes payable | | | | 20 |
| Long-term liabilities | | | | |
| Deferred tax liability | | | | 29,837 |
| **Total liabilities** | | | | **31,843** |
| | | | | |
| **Non-controlling interest** | | | | **11,341** |
| | | | | |
| **Total net assets acquired** | | | | **$ 273,900** |

(i)   Share price based on the price of the shares on September 27th, 2018.

Net income and comprehensive net income for the Company would have been lower by approximately $1,139 and $3,417 for the three and nine months ended February 28, 2018, if the acquisition had taken place on June 1, 2017. In connection with this transaction, the Company expensed transaction costs of $1,133.

104.   In stark contrast to Aphria's previous valuation of the LATAM Assets, Aphria reduced the value of the LATAM Assets' licenses, permits, and applications from C$191,066,000 to C$123,956,000, a reduction equal to C$67,110,000 or a decrease of 35.12%. The 3Q2019 Financial Statements also increased the value ascribed to goodwill from the amount disclosed in the previous quarter's financial statements of C$131,527,000 to C$189,188,000, an increase equal to C$57,661,000, or 43.84%.

105.   Thus, after removing C$189,188,000 in goodwill and subtracting the total liabilities of C$31,843,000 from the remainder of the LATAM Assets, and subtracting the non-controlling interest, the value of the LATAM Assets was a mere C$84,712,000.

106.   In other words, based on Aphria's own valuation, the LATAM Assets value was almost exactly the same value that Scythian paid to DeFrancesco to acquire them in the first place.

107.    Numerous analysts reacted to the impairment news. On April 15, 2019, analyst firm CIBC issued a report noting that, "[t]he $50MM write-down of the LATAM acquisition, in our view, somewhat validates questions about capital allocation."

108.    Also on April 15, 2109, the *Financialpost.com* published an article entitled *Aphria shares tumble on low sales, impairment charge on Latin American assets* that noted that "Shares of Aphria Inc. plunged in morning trading as the cannabis company reported a net loss of $108.2 million in its fiscal third quarter earnings, largely attributed to a one-time non-cash impairment charge of $50 million on its controversial Latin American assets."

109.    On April 16, 2019, the *Investorplace.com* published an article entitled *Aphria Stock Might Be the First Victim as Pot Stocks Face Reality* commenting on the relationship between the impairment and the Hindenburg Report stating that "Aphria's results included a big writedown on one the controversial assets, suggesting that the short sellers were correct about wrongdoing there."

110.    On April 16, 2019, the *Motley Fool* published an article entitled *The 3 Most Important Takeaways From Aphria's Quarterly Results* and noting the impact of the C$50 million impairment:

> Profitability was also dinged heavily last quarter by a CA$50 million impairment charge on its Latin American assets. Aphria came under pressure in 2018 from short-sellers who alleged the prices it paid for its Latin American assets were inflated, and insiders had undisclosed conflicts of interest. An internal review earlier this year found prices paid were at the high end of an acceptable range, but its seems the company may still have overpaid given last quarter's charge.
>
> In management's discussion and analysis of its quarterly results, it disclosed its writing down the value of those assets because of "new financial information received from independent third party's review of the LATAM transaction. This new financial information consisted of lower gross margins and EBITDA margins used by the financial advisor for the Special Committee and recent financial information from the LATAM entities that showed higher than expected expenses." Overall, lower volume, higher costs, and over CA$50 million in impairment charges caused a net loss of CA$108 million, or CA$0.43 per share, in the quarter.

111.     On April 23, 2019, the *Motley Fool* published an article entitled *Marijuana Stocks: Let the Writedowns Begin* that summarized that the C$50 million impairment proved that the Hindenburg Report was correct and was the primary driver for Aphria's stock price drop:

> But Aphria's sales growth wasn't the talking point of its third-quarter report. Nor was it Aphria's proclamation that shareholders reject Green Growth Brands' hostile takeover offer for the company. Rather, it was the company announcing a CA$50 million non-cash impairment charge to the carrying value of its Latin American assets, which were acquired for CA$195 million. This impairment charge, which we'll just simplify by calling a writedown, was the result of the Ontario Securities Commission requesting the company perform an impairment test on its Latin American assets.
>
> ***The end result in the third quarter, mostly as a result of this writedown, was a net loss of CA$108.2 million, or CA$0.43 per share -- the biggest eyesore on Aphria's income statement in the company's reasonably short history as a marijuana company***.
>
> ***What makes this writedown so particularly tough to swallow for Wall Street and investors is that, in early December, short-seller Quintessential Capital Management and forensic analysis firm Hindenburg Research alleged that Aphria grossly overpaid for its Latin American assets.*** Although an independent committee found the acquisition costs to be within an acceptable range, new financial information revealed lower gross margins and EBITDA margin, along with higher-than-expected expenses, necessitating the adjustment. ***In other words, in a roundabout way, Quintessential and Hindenburg's analysis was proven partially correct.***
>
> ***This is also problematic for Aphria, given that an independent committee discovered that insiders had potential conflicts of interest in its Latin American acquisitions. This is what led longtime CEO Vic Neufeld to step down.***
>
> In short, Aphria's management was already suffering from a crisis of confidence, and this writedown didn't help the situation, with the company's stock losing 15% on Monday.

Emphasis added.

## THE CLASS PERIOD BEGINS WITH APHRIA'S ANNOUNCEMENT OF THE LATAM ASSETS ACQUISITION

### A. July 17, 2018: Defendants Announce the LATAM Assets Acquisition

112.    The Class Period begins on July 17, 2018 with Aphria's announcement of the acquisition of the LATAM Assets by entering into the "Share Purchase Agreement" with Scythian to acquire 100% of the issued and outstanding common shares of LATAM Holdings Inc. ("LATAM Holdings"), a direct, wholly-owned subsidiary of Scythian.

113.    On July 17, 2018 before market open, Aphria issued a press release, also filed as Exhibit 99.111 to Aphria's Form 40-F that was signed by Merton and filed with the SEC on October 18, 2018 ("Form 40-F"), announcing the transaction (the "July 17, 2018 Press Release"). The July 17, 2018 Press Release stated in relevant part:

APHRIA PLANS FOR GLOBAL CANNABIS LEADERSHIP WITH INTERNATIONAL EXPANSION ACQUIRING LEADING ASSETS IN LATIN AMERICA AND THE CARIBBEAN

*Aphria medical brands to gain exposure to over 300 million people, roughly 9 times the size of Canada*

Leamington, Ontario — July 17, 2018 — Aphria Inc. ("Aphria" or the "Company") (TSX: APH and US OTC: APHQF) is proud to announce the Company's planned expansion into Latin America and the Caribbean with the proposed acquisition of industry-leading companies in Colombia, Argentina, Jamaica and a right of first offer and refusal in respect of Brazil through a definitive share purchase agreement (the "Agreement") with Scythian Biosciences Inc. ("Scythian"). Aphria will acquire 100% of the issued and outstanding common shares of LATAM Holdings Inc. ("LATAM Holdings"), a direct, wholly-owned subsidiary of Scythian (collectively, the "Transaction").

**Highlights of the Transaction include:**

- Solidifies Aphria's leadership position in the global cannabis industry

- Provides Aphria with world class assets in the most advanced regulatory jurisdictions across LATAM and Caribbean markets, from which it can further grow and expand its international operations

- Strengthens Aphria's leading international management team with the addition of proven local LATAM and Caribbean executives

- Establishes Aphria's presence in the most advanced strategic market in South America, Colombia

- Gains first mover advantage in Argentina for eventual in country cultivation

- Acquires market leadership in Jamaica with the only producing Tier 3 cultivator license in the country

- Yields strategic rights to potentially expand into Brazil, the largest population in South America

- Delivers accretive cash flow beginning in calendar 2019

**Colombia — Strategic Launch Pad into South America**

Colcanna S.A.S. ("Colcanna" or the "Colombian Company"), will be the first company in the Coffee Zone of Colombia with cultivation and manufacturing licenses for the production of medicinal extracts of cannabis, a research license and a license for the production and extraction of cannabis, including cannabis oil, for domestic use and for export. It is in the advanced licensing stages for a THC license.

Unlike the former Guerilla territory where other global cannabis companies have focused their investments, the Coffee Zone has always been a land of peace, high productivity and progress. Colcanna sits on 34 acres of highly fertile, predominately flat land, which is essential for the optimal cultivation of cannabis. As a result, greenhouses will occupy more than 20 acres of the property and, with 6 harvests per year and two natural sources of water for irrigation, Colcanna is expected to achieve an initial annualized production of 30,000 kg, growing to 50,000 kgs but with access to the country's micro-scale growers, suitable for supplying the country and the region with high-quality medical cannabis.

**Argentina — First Mover Advantage**

ABP, S.A. ("ABP" or the "Argentinean Company") is an established and successful pharmaceutical import and distribution company that holds a series of licenses, including for the import of CBD oil, notably the first company in Argentina to have received this license.

The Argentinean Company operates a pharmaceutical distribution warehouse and retail pharmacy and distributes to an extensive network of pharmacies, distributors, government clinics and hospitals throughout Argentina. ABP also holds agreements with the Top 20 health insurance companies, a strategic advantage in reaching patients accessing Argentina's free public healthcare system.

ABP is at the forefront of in-country medical cannabis research and clinical trials with two significant Medical Cannabis Cooperative Agreements. The Argentinean Company has partnered with Hospital Garrahan, a leading pediatric hospital in Buenos Aires, for a clinical study on the treatment of refractory epilepsy in children, and with Universidad Nacional De La Plata to support advances in medical cannabis research and education.

**Jamaica — Only Producing Commercial Tier 3 License**

Marigold Projects Jamaica Limited ("Marigold" or the "Jamaican Company") has been granted several key licenses by the Jamaican Cannabis Licensing Authority, including:

- A Tier 3 license to cultivate more than five acres of land with cannabis for medical, scientific and therapeutic purposes. This license is the highest level of license available in Jamaica, and currently only one other company has been approved for a Tier 3 license;

- A conditional Tier 2 license to process cannabis for medical, scientific and therapeutic purposes, including the manufacturing of cannabis-based products, in a space of over 200 square meters;

- A conditional herb house retail license to sell cannabis products for medical, scientific and therapeutic purposes, with a space for immediate consumption by consumers, including tourists;

- A conditional therapeutic retail license to provide therapeutic or spa services utilizing cannabis products; and

- A conditional R&D license.

Lloyd Tomlinson will continue as Marigold's Managing Director and will be appointed Director, Jamaica Operations at Aphria International. Mr. Tomlinson, a Jamaican native, has more than 20 years' experience in the pharmaceutical industry and as the CEO of Blue Manhoe Estate he became the third-generation of his family to run the family's coffee business. In 2014, Mr. Tomlinson made history when he launched Timeless Herbal Care, Jamaica's first medical cannabis company.

. . .

**Quotes from Leadership**

"Aphria is proud with this initiative to create a true leader in medical cannabis across LATAM and extend our leadership in the global industry," said Vic Neufeld, Chief Executive Officer at Aphria. "We have spent a considerable amount of time

and resources evaluating opportunities in Latin America and the Caribbean and we are confident in the long-term strategic opportunity and the value it will bring to our shareholders. The Transaction, once completed, will firmly place Aphria at the center of the medical cannabis industry in the region, and will provide the strong foundation, relationships and infrastructure to capture significant future growth as more LATAM and Caribbean markets evolve. We truly have the best international team in the business, and we are continuing to bring our industry-leading expertise, experience and know-how to strategic international markets."

**Transaction Details**

. . .

Aphria will acquire the following entities through LATAM Holdings:

- 90% of Colcanna, a Colombian medical cannabis producer, currently holding a CBD cultivation license from the Ministry of Justice and holding a license for processing, extraction, production and research for the local market and export for the international market of cannabis derivatives, from the Ministry of Health. Colcanna expects to receive its THC license from the Ministry of Justice within the next month;

- 100% of ABP, an Argentinean pharmaceutical import and distribution company, currently licensed for the importation of CBD oil for the purposes of research and development;

- 100% of Marigold Acquisitions Inc., a BC incorporated entity, which owns 100% of Hampstead Holdings Ltd., a Bermuda incorporated entity, which owns 49% of Marigold Projects Jamaica Limited, which has received a license to cultivate and conditional licenses to process, sell and provide therapeutic or spa services using cannabis products; and,

114. The statements identified above in paragraph 113 were false and materially misleading because the LATAM Assets were substantially different than represented. As explained above in paragraphs 46 to 72, Marigold, MMJ International, and MMJ Colombia were largely non-operational.

115. Contrary to Aphria's description of Marigold as an active cannabis company in Jamaica, its registered office at 28 Lancaster Road was vacant and abandoned at the time of the acquisition. Its other business locations were likewise non-existent or not operational at the time

of the acquisition: at 38a Trafalgar Road, a cannabis company named "Sensi Medical Cannabis Home" was present but still not operational; at 22 Trafalgar Road, an office existed but no activity was present; and at the property located in Saint Catherine, no cannabis cultivation operations existed.

116.   Similarly, Aphria's description of MMJ International was also materially misleading. Far from having a "a pharmaceutical distribution warehouse and retail pharmacy" that "distribute[d] to an extensive network of pharmacies, distributors, government clinics and hospitals throughout Argentina," at the time of the acquisition ABP S.A. consisted of one retail drug pharmacy (like a Rite-Aid or CVS) and a warehouse without any distribution operations. Additionally, Aphria's claim that ABP S.A. had "partnered" with Hospital Garrahan was also materially misleading considering that it had simply donated cannabis to the hospital for research purposes, as confirmed by Hospital Garrahan.

117.   Aphria's representations about MMJ Colombia were also misleading. ColCanna SAS was not licensed at the time of the acquisition. Moreover, its claim that it would produce an "initial annualized production of 30,000 kg" was also misleading given that the company was not authorized to produce any cannabis during 2018 or 2019 because it had not applied for or received a "quota" from the Colombian government.

118.   Aphria's statements about the LATAM Assets were also materially misleading in because they concealed the fact that the entities did not have the licenses necessary to operate as represented or, alternatively, the licenses that they did possess were not as valuable as claimed. Following an inquiry from the Ontario Securities Commission, Aphria impaired the value of the LATAM Assets by decreasing the value of these licenses by C$50 million.

119.    In addition to misleading investors as to the value and operational status of the LATAM Assets, the above statements also omitted that DeFrancesco and other Aphria insiders had undisclosed interests in the LATAM Assets and would benefit materially from the acquisition. This information was material to investors and should have been disclosed. In addition, by failing to disclose this information, Aphria violated Item 404 of Regulation S-K (17 C.F.R §22 9.404),

120.    Defendants made or caused Aphria to make the above statements in furtherance of their scheme to enrich themselves at the expense of ordinary Aphria shareholders.

**B.    <u>August 1, 2018: Aphria Issues Its Year-End Financials</u>**

121.    On August 1, 2018, Aphria filed its financial statements for the year-ended May 31, 2018 ("4Q2018 Financial Statements") and its MD&A for the same period with SEDAR ("4Q2019 MD&A"). The 4Q2018 Financial Statements and the 4Q2019 MD&A were also filed as attachments to the Form 40-F as Exhibit 99.1 and 99.2, respectively. The 4Q2018 Financial Statements were signed by Defendants Cervini and Cacciavillani. Also on that day, Aphria filed its Annual Information Form with SEDAR which was also attached to the Form 40-F as Exhibit 99.3.

122.    In the 4Q2018 MD&A, Aphria stated the following in pertinent part:

Subsequent to year-end, the Company announced that it would acquire LATAM Holdings Inc. ("LATAM"). The acquisition of LATAM provides the Company with immediate access to the high profile, attractive countries in South America and the Caribbean, including Colombia, Argentina, Jamaica and potentially Brazil.

*Colombia*

The acquisition of LATAM, provides the Company with 90% ownership of Colcanna. This ownership provides the Company with the ability to further develop the global Aphria brand with Aphria branded products distributed to patients in Columbia. Upon Colcanna developing its 34 acres of land for the cultivation of cannabis, which is expected to provide 50,000 kgs annually, the Company will maintain the control of the cultivation and distribution of cannabis in Columbia. Until the emerging Colombian market demand grows to match the Company's

51

Colombian production, the Company will be able to utilize its export license to distribute the excess production globally.

*Argentina*

The acquisition of LATAM, provides the Company with sole ownership of APB, providing the Company with a significant first-mover advantage, as APB is the first company with an in-country medical cannabis research licence. The Company also continues to work with Hospital Garrahan, a leading pediatric hospital in Buenos Aires. The Company believes that, once the Argentinian government approves medical cannabis, in-country cultivation opportunities will be attractive.

*Jamaica*

The acquisition of LATAM provides the Company with a 49% ownership interest in Marigold Projects Jamaica Limited ("Marigold"), through multiple subsidiaries and a 95% royalty on profits through an Intellectual Property agreement. This acquisition will provide the Company with several key licences including a Tier 3 cultivation licence, a Tier 2 herb house licence, as well as licences for import, export and research purposes.

123.     The statements identified above in paragraph 122 were false and materially misleading because the LATAM Assets were substantially different than represented. As explained above in paragraphs 46 to 72, Marigold, MMJ International, and MMJ Colombia were largely non-operational. In addition, the above statements also omitted that DeFrancesco and other Aphria insiders had undisclosed interests in the LATAM Assets and would benefit materially from the acquisition. Defendants made or caused Aphria to make the above statements in furtherance of their scheme to enrich themselves at the expense of ordinary Aphria shareholders.

124.     With its Annual Information Form, Aphria filed certifications on behalf of Neufeld and Merton attesting to the accuracy of the company's 4Q2018 Financial Statements, 4Q2018 MD&A, and Annual Information Form. Neufeld's and Merton's certifications, dated August 1, 2018 stated in pertinent part that:

1. **Review**: I have reviewed the AIF, if any, annual financial statements and annual MD&A, including, for greater certainty, all documents and information that are

incorporated by reference in the AIF (together, the "annual filings") of Aphria Inc. (the "issuer") for the financial year ended May 31, 2018.

2. **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the annual filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, for the period covered by the annual filings.

. . .

8. **Reporting to the issuer's auditors and board of directors or audit committee**: The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of ICFR, to the issuer's auditors, and the board of directors or the audit committee of the board of directors any fraud that involves management or other employees who have a significant role in the issuer's ICFR.

125.    Neufeld's and Merton's certifications were false and/or materially misleading because Aphria's filings had in fact omitted material information from investors and concealed that Aphria's acquisition of the LATAM Assets was a sham transaction being carried out in furtherance on an ongoing fraudulent scheme.

**C.**    **September 27, 2018: Aphria Closes the Transaction on the LATAM Assets**

126.    On September 27, 2018, during market hours, Aphria issued a press release, also filed as Exhibit 99.133 to Aphria's Form 40-F filed with the SEC on October 18, 2018, stating it completed the Acquisition. In relevant part, the press release stated:

**Aphria Closes Acquisition of Assets in Latin America and the Caribbean**
*Company cements foothold in the region with operations in Colombia, Argentina and Jamaica*

Leamington, Ontario – September 27, 2018 – Aphria Inc. ("Aphria" or the "Company") (TSX: APH and US OTC: APHQF) today announced that it has closed the acquisition of LATAM Holdings Inc. ("LATAM Holdings") from Scythian Biosciences (CSE:SCYB; Frankfurt: 9SB; OTC – Nasdaq Intl: SCCYF).   The Transaction was funded by the assumption of US$1 million of existing LATAM Holdings debt with the remaining consideration funded by the issuance of 15,678,310 common shares of Aphria.  The closing was pursuant to the terms of the definitive share purchase agreement (the "Agreement") previously announced by the Company on July 17, 2018.

As a result of the Transaction, the Company has solidified an important foothold in Latin America and the Caribbean by acquiring industry-leading cannabis-related companies in Colombia, Argentina and Jamaica as well as a right of first offer and refusal in respect of a majority interest in a Brazilian entity seeking a cannabis cultivation and sales license.

"Aphria continues to execute on its plans for strategic international expansion, including in Latin America and the Caribbean," said Vic Neufeld, Chief Executive Officer of Aphria. "With a combined population of nearly 640 million, and with significant momentum from numerous countries introducing new or modernizing existing medical cannabis legislation, the region represents a significant opportunity for long-term growth. It also hosts some of the most favourable conditions for cultivating high-quality medical cannabis at substantial efficiencies – ideal for both regional supply and export opportunities. This acquisition firmly cements Aphria's leadership in the region and on the global cannabis stage."

As a result of the Agreement, the Company has acquired:

- A 90% ownership interest in Colcanna S.A.S. ("Colcanna"), the first company in the Coffee Zone of Colombia with cultivation and manufacturing licenses for the production of medicinal extracts of cannabis, a research license and a license for the production and extraction of cannabis, including cannabis oil, for domestic use and for export. It is in the advanced licensing stages for a THC license.

- ABP, S.A. ("ABP""), an established and successful pharmaceutical import and distribution company in Argentina which supported a number of University Hospitals to secure an import permit for cannabis oil. Aphria and ABP, in close partnership with the Argentinean government, will continue to advance opportunities for medical cannabis in the country, including the potential for in-country cultivation and pharmacy distribution of cannabis products.

- A 49% ownership interest in Marigold Projects Jamaica Limited ("Marigold"), which has received one of the only Tier 3 cultivation licenses in the country cultivate and conditional licenses to process, sell, provide therapeutic or spa services using cannabis products, and to operate herb houses to sell cannabis products for medical, scientific and therapeutic purposes, with a space for immediate consumption by consumers.

- A right of first offer and refusal in respect of a majority interest in a Brazilian entity, upon the receipt of a license, in the entity receiving the license.

LATAM Holdings' highly experienced and influential leadership team will remain

intact and join Aphria International to continue to advance the Company's interests throughout the region.

127.    The statements identified above in paragraph 126 were false and materially misleading because the LATAM Assets were substantially different than represented. As explained above in paragraphs 46 to 72, Marigold, MMJ International, and MMJ Colombia were largely non-operational. In addition, the above statements also omitted that DeFrancesco and other Aphria insiders had undisclosed interests in the LATAM Assets and would benefit materially from the acquisition. Defendants made or caused Aphria to make the above statements in furtherance of their scheme to enrich themselves at the expense of ordinary Aphria shareholders.

128.    Following Aphria's above announcement, the trading price of Aphria's shares increased substantially from a closing price of $7.94 per share on July 17, 2018 to $13.64 on September 27, 2018. The increase in Aphria's stock price resulted in an immediate increase in the value of the consideration being given to Scythian, given that Aphria was paying for the LATAM Assets in stock. While Aphria had initially agreed to pay 15,678,310 shares of Aphria valued at C$193,000,000, the final value of the shares given to Scythian exceeded C$273,900,000, or a 41.9% increase in the cost of the transaction. This resulted in Aphria recording goodwill in the amount of C$131,527,000 for the LATAM Assets.

**D.    October 12, 2018: Aphria Reports Financial Results for the First Quarter of 2019.**

129.    On October 12, 2018, Aphria filed on SEDAR its financial statements for the first fiscal quarter ended August 31, 2018 ("1Q2019 Financial Statements") and its Management's Discussion & Analysis for the quarter ("1Q2019 MD&A"). Aphria also filed the 1Q2019 Financial Statements as Exhibit 99.142 and the 1Q2019 MD&A as Exhibit 99.143 to the Form 40-F. The 1Q2019 Financial Statements were approved and signed on behalf of Aphria's board of directors by Cervini and Cacciavillani. Additionally, the 1Q2019 Financial Statements and the 1Q2019

MD&A were accompanied by Form 52-109F2 Certifications signed by Neufeld and Merton certifying to the verity of the statements contained therein as well as that Aphria had established and maintained disclosure controls and procedures and internal control over financial reporting which were originally filed on SEDAR and were also attached the Form 40-F as Exhibits 99.144 and 99.145.

130.   In the 1Q2019 MD&A Defendants continued to make various representations concerning the LATAM Assets. Specifically, the 1Q2019 MD&A stated:

> *LATAM Holdings Inc.*
>
> Subsequent to period-end, the Company completed the acquisition of LATAM Holdings Inc. ("LATAM"). The acquisition of LATAM provides the Company with immediate access to the high profile, attractive countries in South America and the Caribbean, including Colombia, Argentina, Jamaica and potentially Brazil.
>
> *Colombia*
>
> The acquisition of LATAM provides the Company with 90% ownership of Colcanna. This ownership provides the Company with the ability to further develop the global Aphria brand with Aphria branded products distributed to patients in Colombia. Upon Colcanna developing its 34 acres of land for the cultivation of cannabis, which is expected to provide 50,000 kgs annually, the Company will maintain the control of the cultivation and distribution of cannabis in Colombia. Until the emerging Colombian market demand grows to match the Company's Colombian production, the Company will be able to utilize its export licence to distribute the excess production globally.
>
> *Argentina*
>
> The acquisition of LATAM provides the Company with sole ownership of APB, providing the Company with a significant first-mover advantage, as APB is the first company with an in-country medical cannabis research licence. The Company also continues to work with Hospital Garrahan, a leading pediatric hospital in Buenos Aires. The Company believes that, once the Argentinian government approves medical cannabis, in-country cultivation opportunities will be attractive.
>
> *Jamaica*
>
> The acquisition of LATAM provides the Company with a 49% ownership interest in Marigold Projects Jamaica Limited ("Marigold"), through multiple subsidiaries

and a 95% royalty on profits through an Intellectual Property agreement. This acquisition will provide the Company with several key licences including a Tier 3 cultivation licence, a conditional Tier 2 herb house licence, as well as conditional licences for import, export and research purposes.

131.     The statements identified above in paragraph 130 were false and materially misleading because the LATAM Assets were substantially different than represented. As explained above in paragraphs 46 to 72, Marigold, MMJ International, and MMJ Colombia were largely non-operational. In addition, the above statements also omitted that DeFrancesco and other Aphria insiders had undisclosed interests in the LATAM Assets and would benefit materially from the acquisition.

132.     Defendants made or caused Aphria to make the above statements in furtherance of their scheme to enrich themselves at the expense of ordinary Aphria shareholders.

133.     Neufeld and Merton also filed certifications attesting to the accuracy of the 1Q2019 Financial Statements and the 1Q2019 MD&A. Neufeld's and Merton's certifications, dated October 12, 2018 stated in pertinent part that:

1. **Review**: I have reviewed the interim financial statements and interim MD&A (together, the "interim filings") of Aphria Inc. (the "issuer") for the interim period ended **August 31, 2018.**

2. **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

134.     Neufeld's and Merton's certifications were false and/or materially misleading because Aphria's filings had in fact omitted material information from investors and concealed that Aphria's acquisition of the LATAM Assets was a sham transaction being carried out in furtherance on an ongoing fraudulent scheme.

135.    On October 12, 2018, Aphria held a conference call to discuss the first fiscal quarter 2019 results ("1Q2019 Conference Call"). During the question and answers portion of the 1Q2019 Conference Call, Matt Bottomley of Canaccord Genuity inquired about what the market should expect in 2019 concerning the Latin America Market. In response, Neufeld stated:

**Matt Bottomley Canaccord Genuity Limited, Research Division – Analyst**

That's helpful. Just last question on my end, moving to the international side of thing. Maybe just an general overview or quick commentary on what we should be looking for in 2019 in the LatAm market, that's something that I think is becoming a lot more exciting? Obviously, a lot of countries there are trying to roll out their programs and secure supply. You guys have taken a pretty big dive there into that market. Just curious on what we investors should be looking for in the next 12 months in that region, in general?

**Victor Neufeld Aphria Inc. – Chair of the Board of Directors, CEO & President**

So let's do the countries individually as part of our LATAM transaction. I'll start with the easiest and then go to the biggest at the end. . . . Jamaica. Jamaica, we have existing cultivation licenses. We have inventory on hand. We have herb houses that are completed and that will be completed in the next few months. So I think you're going to see a modest level of revenue coming from Jamaica. It's not -- certainly not the biggest part of that LATAM transaction but it will likely be the first to have repeatable sales. In Argentina, we have announced the hospital clinical drug trial with Hospital Garrahan at 6,000 bottles of our Rideau CBD oil. We have applied for export and import certificates related to that, and we hope to be able to announce successful delivery of that product in the short term. That transaction will bleed through Fiscal '19 for those 6,000 bottles. On the Columbian side, Columbia was obviously the crown jewel in that acquisition. The facility continues its greenhouse build. We are looking to export product from Canada into the Colombian market on a short-term basis to help fill supply, but you will see in fiscal or – I'm sorry, in calendar '19, you will see revenues from Columbia.

136.    The statements identified above in paragraph 135 were false and materially misleading because the LATAM Assets were substantially different than represented. As explained above in paragraphs 46 to 72, Marigold, MMJ International, and MMJ Colombia were largely non-operational. In addition, the above statements also omitted that DeFrancesco and other Aphria insiders had undisclosed interests in the LATAM Assets and would benefit materially from

the acquisition. Defendants made or caused Aphria to make the above statements in furtherance of their scheme to enrich themselves at the expense of ordinary Aphria shareholders.

**E.      December 4, 2018: Aphria's Response to the Hindenburg Report.**

137.    Hindenburg Research published its report on Aphria on December 3, 2018. The following day, on December 4, 2018 before the market opened, Aphria issued a press release, also filed as an exhibit to a Form 6-K, in response to the Hindenburg Report (the "December 4, 2018 Aphria Response Press Release") that provided a list of reasons as to why "Aphria Unequivocally Stands Behind its LATAM Operations." Notably, the press release also quoted Neufeld concerning insiders purchases of Aphria shares of C$3.1 million on the same day at which Aphria stock price reached its then lowest close in the U.S. markets.  The Form 6-K was signed by Merton.

138.    The December 4, 2018 Aphria Response Press Release stated in relevant part:

**Aphria Unequivocally Stands Behind its LATAM Operations**

. . .

**Background: LATAM Holdings Acquisition**

Aphria is committed to good corporate governance and transparency.  The LATAM acquisition was a transaction negotiated at arms' length between two publicly traded companies each of which retained professional financial advisors (one of which provided a formal valuation of the acquired assets).  Aphria and SOL Global Investments Corp. (formerly Scythian Biosciences Corp.) ("SOL") are not "sister" companies and were not "sister" companies at the time the Transaction was agreed to between the parties.

In connection with the Transaction, the Company notes, among other things, the following:

- The Board of Directors of Aphria received financial advice and a fairness opinion from Cormark Securities Inc., the Company's independent and qualified financial advisor, that the consideration to be offered by Aphria in respect of the transaction was fair, from a financial point of view, to Aphria.

- The Company believes that the purchase price paid under the Transaction was comparable with similar Latin America acquisitions by other large cap,

Canadian licensed producers.

- The Transaction resulted in minimal dilution to Aphria shareholders (6.6% basic / 6.3% fully diluted).

- The Company retained leading transaction counsel in each jurisdiction who completed extensive legal due diligence on the assets, licenses and businesses in each jurisdiction.

- Representatives of Aphria travelled to Colombia, Argentina, Jamaica and Brazil to conduct due diligence regarding the assets to be acquired which included management meetings, site visits by senior management in each country and meetings with local authorized representatives.

- The Company entered into a negotiated share purchase agreement with SOL in connection with the Transaction which contained extensive representations, warranties, covenants, conditions and indemnities which survived the closing of the Transaction.

- In its press release announcing the transaction, the Company transparently disclosed that certain insiders of Aphria owned a de minimis amount of shares and warrants of SOL and that such insiders had disclosed such interests to the Board of Directors and recused themselves from the deliberations during which the Transaction was discussed and from voting on the resolution approving the Transaction.

- Since the completion of the Transaction, the Company has successfully integrated the operations in each jurisdiction, and provides the following updates:

**Colombia**

- Aphria owns a 90% interest in Colcanna S.A.S. ("Colcanna"). Colcanna has received all required licenses for cultivation, processing, export, research and commercialization.

- Colcanna sits on 34 acres of highly fertile, predominately flat land, which is essential for the optimal cultivation of cannabis, including the greenhouse which sits on the acreage that recently housed mother plants.

- The Company has recently signed a Promissory Letter for the purchase of the additional 8 hectares of land immediately adjacent to existing property for expansion.

- Colcanna is licensed to cultivate psychoactive and non-psychoactive cannabis. The licenses held by Colcanna also permit cultivation, export,

research and processing.

- Colcanna was also granted by the Colombian Agricultural Institute, on October 30, 2018 a characterization permit pursuant to Resolution No. 35244 and No. 35245 allowing the company to assess seeds and initiated a pilot test of its strains prior to full scale cultivation.

- Greenhouses are planned for more than 20 acres of the property, with 6 harvests expected per year.

- Colcanna is expected to achieve an initial annualized production of 30,000 kg, growing to up to 50,000 kgs, suitable for supplying the country and the region with high-quality medical cannabis.

- There are 48 employees in Columbia, dedicated to cultivation and advancing business interests.

**Jamaica**

- Marigold is fully operational with:

    o An issued Tier 3 license to cultivate more than five acres of land with cannabis for medical, scientific and therapeutic purposes;

    o An issued Research and Development License;

    o A conditional Tier 2 license to process cannabis for medical, scientific and therapeutic purposes, including the manufacturing of cannabis-based products, in a space of over 200 square meters;

    o A conditional herb house retail license to sell cannabis products for medical, scientific and therapeutic purposes, with a space for immediate consumption by consumers, including tourists; and

    o A conditional therapeutic retail license to provide therapeutic or spa services utilizing cannabis products.

- Marigold's cultivation farm is operational and has harvested approximately 2,500 kg of cannabis to date.

- The Company has taken possession of 10 acres of land at Block B, Lot 2, part of Bernard Lodge, St. Catherine, from the Sugar Company of Jamaica in anticipation of expanding its cultivation as demand dictates.

- Two Herb House locations, the first in Kingston, namely the Sensi Medical Cannabis House, and the second, Portmore, are expected to open in January

2019, additional locations are currently planned for other high demand regions of Jamaica.

- Jamaica boasts 22 employees dedicated to the cultivation, processing and operations of the facility and maintenance of the corporate brand.

**Argentina**

- Aphria's subsidiary in Argentina, ABP, is a well-established and successful pharmaceutical import and distribution company.

- ABP is championing the research and clinical study of medical cannabis, including through its partnership with Hospital de Pediatria Garrahan, one of the most recognized and credible medical institutions in South America.

- In October 2018, ABP delivered 1,500 bottles of Aphria's renowned Rideau CBD oil, which were provided to Hospital de Pediatria Garrahan for use in a clinical study focused on treating refractory epilepsy in children. The clinical study, which involves 100 patients and will be conducted over 2.5 years, will be one of the foundational global scientific and medical studies of its kind focused on treating refractory epilepsy in children.

- In order to undergo its ISO 9001 inspection on October 25, 2018, ABP engaged in a retrofit of the building in October 2018.

- Aphria and ABP, in close partnership with the Argentinean government, continue to advance opportunities for medical cannabis in the country, including the potential for in-country cultivation.

- APB operates a pharmaceutical distribution warehouse and retail pharmacy and distributes to an extensive network of pharmacies, distributors, government clinics and hospitals throughout Argentina.

- ABP also holds agreements with the Top 20 health insurance companies, a strategic advantage in reaching patients accessing Argentina's free public healthcare system.

139.    The statements identified above in paragraph 138 were false and materially misleading because the LATAM Assets were substantially different than represented. As explained above in paragraphs 46 to 72, Marigold, MMJ International, and MMJ Colombia were largely non-operational. In addition, the above statements also omitted that DeFrancesco and other Aphria insiders had undisclosed interests in the LATAM Assets and would benefit materially from

the acquisition. Defendants made or caused Aphria to make the above statements in furtherance of their scheme to enrich themselves at the expense of ordinary Aphria shareholders.

**F.      January 11, 2019: Aphria Reports Financial Results for Second Quarter of 2019.**

140.     On January 11, 2019, Aphria also filed a Form 6-K (the "2Q2019 Form 6-K") with the SEC that included as Exhibit 99.1 its financial statements for the second fiscal quarter ended November 20, 2018 ("2Q2019 Financial Statements") and as Exhibit 99.2 Management's Discussion & Analysis for the quarter ("2Q2019 MD&A"). The Form 2Q2019 Form 6-K was signed by Merton and the 2Q2019 Financial Statements were approved and signed on behalf of Aphria's board of directors by Cervini and Cacciavillani. Additionally, the 2Q2019 Financial Statements and the 2Q2019 MD&A were accompanied by Form 52-109F2 Certifications signed by Neufeld and Merton certifying to the verity of the statements contained therein as well as that Aphria had established and maintained  disclosure controls and procedures and internal control over financial reporting.

141.     The 2Q2019 Financial Statements detailed the significance of the LATAM Assets to Aphria and provided a preliminary estimated fair value of the LATAM Assets acquired. The 2Q2019 Financial Statements stated in relevant part:

> LATAM Holdings, through other subsidiaries, provides the Company with access to the emerging cannabis markets in Latin America and the Caribbean. Through this acquisition, the Company has secured key licenses in Colombia, Argentina and Jamaica which is anticipated to provide substantial first mover advantage in these countries. In addition, the Company acquired an option and rights of first refusal to purchase a Brazilian incorporated entity, with the option and right of first refusal vesting only upon the entity obtaining a medical cannabis cultivation, processing and distribution license in Brazil.
>
> The Company is in the process of assessing the fair value of the net assets acquired and, as a result, the fair value of the net assets acquired may be subject to adjustments pending completion of final valuations and post closing adjustments. The table below summarizes the preliminary estimated fair value of the assets acquired and the liabilities assumed at the effective acquisition date:

| | Note | Number of shares | Share price | Amount |
|---|---|---|---|---|
| **Consideration paid** | | | | |
| Shares issued | (i) | 15,678,310 | $ 17.47 | $ 273,900 |
| **Total consideration paid** | | | | **$ 273,900** |
| | | | | |
| **Net assets acquired** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | | | | 2,704 |
| Accounts receivable | | | | 571 |
| Other current assets | | | | 106 |
| Inventory | | | | 65 |
| Long-term assets | | | | |
| Capital assets | | | | 494 |
| Licences, permits & applications | | | | 191,066 |
| Goodwill | | | | 131,527 |
| **Total assets** | | | | **326,533** |
| Current liabilities | | | | |
| Accounts payable and accrued liabilities | | | | 1,986 |
| Income taxes payable | | | | 20 |
| Long-term liabilities | | | | |
| Deferred tax liability | | | | 50,627 |
| **Total liabilities** | | | | **52,633** |
| | | | | |
| **Total net assets acquired** | | | | **$ 273,900** |

(i)   Share price based on the price of the shares on September 27th, 2018.

Net income and comprehensive net income for the Company would have been lower by approximately $1,139 and $2,278 for the three and six months ended November 30, 2017, if the acquisition had taken place on June 1, 2017. In connection with this transaction, the Company expensed transaction costs of $1,133.

(Dollar amounts are in thousands of Canadian dollars.)

142.    Aphria's representations concerning the value of the LATAM Assets was false and/or materially misleading. As confirmed by Aphria on April 15, 2019, the value of the licenses, permits, and applications acquired with the LATAM Assets was in fact $123,956,000 (not $191,066,000). In addition, the amount of goodwill acquired with the LATAM Assets was $189,188,000 (not $131,527,000). Although Aphria attributed the impairment to information provided to it by an independent third party, the information received existed and was already known by Aphria prior to the acquisition.

143.    Before filing its 2Q2019 Financial Statements, Aphria and its senior management, including Neufeld and Merton, were aware of the contents of the Hindenburg Report and QCM Presentation which raised credible challenges to the value of the LATAM Assets as reflected in the 2Q2019 Financial Statements.

144.    In the 2Q2019 MD&A, Aphria continued to make various representations concerning the LATAM Assets. Specifically, the 2Q2019 MD&A stated:

> LATAM Holdings Inc. ("LATAM") is a subsidiary of the Company acquired in September 2018. LATAM holds key licences in Colombia, Argentina and Jamaica through its subsidiaries MMJ Colombia Partners Inc., Marigold Acquisitions Inc., Hampstead Holdings Ltd., MMJ International Investments Inc., ABP, S.A., Marigold Projects Jamaica Limited, and ColCanna S.A.S. Through the LATAM acquisition, the Company also obtained the rights to purchase a majority interest in a Brazilian incorporated entity, upon that Brazilian entity obtaining a medical cannabis cultivation, processing and distribution licence in Brazil.

> . . .

> *LATAM Holdings Inc.*

> The acquisition of LATAM provides the Company with various production, distribution and market development opportunities in South America and the Caribbean, including Colombia, Argentina, Jamaica and potentially Brazil.

> *Colombia*
> The acquisition of LATAM provides the Company with 90% ownership of Colcanna S.A.S. ("Colcanna"). This ownership provides the Company with the ability to further develop the global Aphria brand with Aphria branded products distributed to patients in Colombia. Upon Colcanna developing its 54 acres of land, including its recent commitment to acquire an additional 20 acres of land, for the cultivation of cannabis, which is expected to provide 50,000 kgs annually, the Company will maintain the control of the cultivation and distribution of cannabis in Colombia. Until the emerging Colombian market demand grows to match the Company's Colombian production, the Company will be able to utilize its export licence to distribute the excess production globally.

> *Argentina*
> The acquisition of LATAM provides the Company with sole ownership of ABP, S.A. ("**APB**"), providing the Company with a significant first-mover advantage, as APB is the first company with an in-country medical cannabis research licence. The Company also continues to work with Hospital Garrahan, a leading pediatric

hospital in Buenos Aires. The Company believes that once the Argentinian government approves medical cannabis, in-country cultivation opportunities will be attractive.

*Jamaica*
The acquisition of LATAM provides the Company with a 49% ownership interest in Marigold Projects Jamaica Limited ("**Marigold**"), through multiple subsidiaries and a 95% royalty on profits through an Intellectual Property agreement. This acquisition will provide the Company with several key licences including a Tier 3 cultivation licence, a conditional Tier 2 herb house licence, as well as conditional licences for import, export and research purposes.

145.     The statements identified above in paragraph 144 were false and materially misleading because the LATAM Assets were substantially different than represented. As explained above in paragraphs 46 to 72, Marigold, MMJ International, and MMJ Colombia were largely non-operational. In addition, the above statements also omitted that DeFrancesco and other Aphria insiders had undisclosed interests in the LATAM Assets and would benefit materially from the acquisition. Defendants made or caused Aphria to make the above statements in furtherance of their scheme to enrich themselves at the expense of ordinary Aphria shareholders.

146.     Neufeld and Merton also filed certifications attesting to the accuracy of the 1Q2019 Financial Statements and the 2Q2019 MD&A. Neufeld's and Merton's certifications, dated January 11, 2019 stated in pertinent part that:

1. **Review**: I have reviewed the interim financial statements and interim MD&A (together, the "interim filings") of Aphria Inc. (the "issuer") for the interim period ended **November 30, 2018.**

2. **No misrepresentations**: Based on my knowledge, having exercised reasonable diligence, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings.

3. **Fair presentation**: Based on my knowledge, having exercised reasonable diligence, the interim financial report together with the other financial information included in the interim filings fairly present in all material respects the financial

66

condition, financial performance and cash flows of the issuer, as of the date of and for the periods presented in the interim filings.

147.   Neufeld's and Merton's certifications were false and/or materially misleading because Aphria's filings had in fact omitted material information from investors and concealed that Aphria's acquisition of the LATAM Assets was a sham transaction being carried out in furtherance on an ongoing fraudulent scheme.

148.   That same day during market hours, Aphria held a conference call to discuss the second fiscal quarter results ("2Q2019 Conference Call"). During the questions and answers portion of the 2Q2019 Conference Call, an analyst at Scotiabank Global Banking and Markets inquired about the "disconnect between the underlying cost of obtaining international licenses and the cost to acquire companies with international licenses" to which Neufeld responded by discussing the ABP acquisition in Argentina and Merton discussed cost and risk differential between obtaining versus buying licenses:

**Oliver S. Rowe Scotiabank Global Banking and Markets, Research Division – Associate**

So there's a disconnect between the underlying cost of obtaining international licenses and the cost to acquire companies with international licenses. Could you reconcile that delta for us and about how you think about license-based acquisitions and why that delta exists?

**Victor Neufeld Aphria Inc. – CEO & Director**

Yes. Oliver, when we look at penetration of other markets outside of Canada, we look at the population, we look at their departments or ministries of health. We look at what chronic conditions are in need of alternate medical assistance called cannabis, specifically CBD oil. So if I could just use as, by way of an example, Argentina. It was very simple for us. Population, all of the metrics fit our metrics of looking and investigating into a market. Epileptic seizure control, we had an ideal product called our Rideau oil, high CBD. That was a great transition away from Charlotte's Web, where a lot of Argentinians were flying to the U.S. to acquire that product and bringing it back illegally. We met with the Ministry of Health, the Ministry of Agricultural, all of the right metrics and what we've learned and what they wanted to proceed with was opportunistic for Aphria to move forward in a

more meaningful way in terms of penetrating. In that particular country though, the license was not an in-country cultivation. They have made progress since then. But at the time, it was an import license, almost a permit through a pharma distributor, which eventually what we acquired was ABP. So Oliver, there is -- from time to time, it will be a hard number to understand when you acquire licenses, it's not the immediacy rather what is the long-term win and does it fit the Aphria definition of medical cannabis and Argentina was the example I cite.

**Carl A. Merton Aphria Inc. – CFO**

So I think if I could just add to that answer. I think one of the other important things once you get past the fact situations, if you step back a little bit to a more general view of the question. The big difference between going to a country yourself and starting the process up and acquire -- and building that license versus acquiring it is the risk and the capital costs associated with it. When you're doing, like Vic said, and moving into a country that hasn't formally adopted this process yet and you're dealing with GR and IR expenses to build awareness in the country, when you're going out and acquiring land and taking the time to build that license from scratch, there is a significant amount of risk and expenses that would end up sitting on your income statement. And acquiring those licenses after it's already been developed removes a lot of that risk from the equation.

149.     The statements identified above in paragraph 148 were false and materially misleading because the LATAM Assets were substantially different than represented. As explained above in paragraphs 46 to 72, Marigold, MMJ International, and MMJ Colombia were largely non-operational. In addition, the above statements also omitted that DeFrancesco and other Aphria insiders had undisclosed interests in the LATAM Assets and would benefit materially from the acquisition. Defendants made or caused Aphria to make the above statements in furtherance of their scheme to enrich themselves at the expense of ordinary Aphria shareholders.

## ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER

**A.     Defendants Admitted There Was an Undisclosed Conflict of Interest in the Transaction Known by the Non-Independent Members of the Board**

150.     In the February 15, 2019 Press Release, Aphria announced that "[b]ased on further information available to the Special Committee, it appears that certain of the non-independent

directors of the Company had conflicting interests in the Acquisition that were not fully disclosed to the Board."

151.    Neufeld, Cacciavillani, and Cervini were the non-independent directors with "conflicting interests" in the transaction. Given that Neufeld, Cacciavillani, and Cervini were executives and directors on Aphria's board, they acted with scienter when deciding to conceal their interests from Aphria's other directors.

152.    By virtue of their positions as executives and directors, Neufeld's, Cacciavillani's, and Cervini's knowledge is imputed to Aphria.

**B.    Neufeld and Persofsky Were on Scythian's Board for the Signing of the Scythian's Letters of Intent to Acquire the LATAM Assets; Scythian's Revolving Door of Directors Supports a Scheme was Afoot.**

153.    At the time Scythian began looking for the LATAM Assets through the time the Scythian board approved the transaction, Scythian had a slew of director resignations. These departures began in mid-January right before Scythian began looking for the LATAM Assets in February 2018. These departures allowed for the appointment of directors that would approve the letters of intent on the LATAM Assets in light of DeFrancesco's involvement and the scheme to sell the LATAM Assets to Aphria at an inflated value.

154.    On January 15, 2018, in advance of executing the letters of intent, two of Scythian's directors (Michael Petter and Peter Benz) resigned and were replaced with Neufeld and George Scorsis. Scorsis was CEO of Liberty, a joint venture between DeFrancesco, Aphria, and Scythian, and thus had close ties to Neufeld and DeFrancesco.

155.    On March 7, 2018, just three days prior to the first letter of intent being signed for the LATAM Assets, two more of Scythian's directors (Roger Rai and Gary Leong) resigned and

were replaced by Renah Persofsky and Robert Reid. Persofsky was a director of Aphria and Reid was Scythian's CEO (as of April 25, 2018).

156.    Scythian proceeded to sign the letters of intent for the LATAM Assets, starting with MMJ International on March 11, then Marigold on March 21, and finally MMJ Colombia on April 8. Once completed the letters of intent were completed, Neufeld and Persfosky resigned from Scythian's board effective April 25, 2018.

157.    Notably, Rai returned to Scythian's board on April 25, 2018 after Persofsky and Neufeld resigned. The fact that Rai stepped down from Scythian's board during (and only during) the period while it was signing the letters of intent supports the conclusion that his absence was intentional. In order to effect Scythian's purchase of the LATAM Assets, the board needed to be under the complete control of DeFrancesco and Neufeld (which, given Rai's absence, it was).

**C.      Aphria, the Board, and Its Financial Advisors Had Access to the LATAM Assets, Their Financials, Licenses, and Projections**

158.    Aphria conducted due diligence concerning the LATAM Assets in advance of agreeing to purchase them. This due diligence included an electronic "Data Room" that contained "all necessary licenses, certificates, approvals and permits from all federal, provincial, state, foreign and other regulatory authorities, licenses, certificates, approvals and permits that are material to any Target Corporation or the Business[.]"

159.    The data room also provided Aphria with access to "[t]rue, correct and complete copies of the Financial Statements" for the LATAM Assets as well as financial forecasts. Specifically, the transaction agreement between Scythian and Aphria stated the following:

> "Financial Statements" means (i) the audited annual financial statements of ABP for the year ended December 31, 2017; (ii) the unaudited management financial statements of MMJ International for the period ended May 7, 2018; (iii) the unaudited financial statements of Marigold Acquisitions for the period ended June 30, 2018 (iv) the unaudited management financial statements of Marigold for the

period ended May 31, 2018; (v) the unaudited management financial statements of MMJ Colombia for the period ended July 13, 2018; and (vi) the unaudited management financial statements of Colcanna for the period ended June 30, 2018.

*     *     *

"Forecast" means the financial forecast prepared by Scythian in respect of the Target Corporations and the operation of the Business and delivered to the Purchaser and Cormark Securities Inc. on July, 2018.

160.   The materials made available to Aphria by Scythian included:

- the five-year financial model provided by MMJ International and ABP;

- review of 2014, 2015, 2016, and 2017 financial statements provided by MMJ International and ABP;

- review of detailed company information on ABP's products, operations, customers, as well as its locations;

- review of the 10-year financial model provided by MMJ Colombia, Colcanna and Scythian management; review of Colcanna's Colombian banking information provided by Scythian management;

- review of the license documentation dated February 16, 2018, issued by the Colombian government to Colcanna on its license for research, production, and

- extraction of Cannabis, including oil production, for domestic use and export;

- review of the license documentation dated February 19, 2017 issued by the Colombian government to Colcanna on its license for the cultivation of cannabis

- CBD and THC;

71

- review of the license documentation dated February 19, 2017 issued by the Colombian government to Colcanna on its license for seed production and research; and

- review of the license documentation dated April 23, 2018 issued by the Colombian government to Colcanna on its CBD license.

161.    Additionally, during negotiations with Scythian concerning the acquisitions of MMJ Columbia and Marigold, Robert Reid (Scythian's CEO), Neufeld, Cacciavillani, Merton, and other insiders traveled to the various LATAM Assets locations. In June 2018, Neufeld and Cacciavillani traveled to Colombia to meet with ColCanna's management and visit the entity's field operations. The following month, in July 2018, Merton traveled to Jamiaca to inspect Marigold Projects' operations.

162.    Thus, Defendants and Aphria's financial advisor in acquiring the LATAM Assets, Cormark Securities, Inc. ("Cormark"), had access to all relevant information and thus knew that the LATAM Assets were not operational and not worth the amounts claimed by Scythian or Aphria.

**D.     Aphria Insiders Previously Enriched Themselves from Undisclosed Conflicts of Interest and Financial Interests Aphria's Transaction with Nuuvera.**

163.    Aphria and its board were well aware of the issues concerning undisclosed conflicts of interest by Neufeld, Merton, Cacciavillani, and Cervini, among other Aphria insiders in deals with third-parties, including nascent companies and deals orchestrated by DeFrancesco and his company, the Delavaco Group.

164.    Neufeld, Merton, Cacciavillani, and Cervini all had undisclosed interests in the Nuuvera deal. As demonstrated by an article written by *The Globe and Mail*, the Nuuvera transaction resulted in "seven Aphria insiders with a multimillion-dollar windfall." Moreover,

article noted that "[e]ven though the four Aphria executives have much larger stakes in Aphria than they did Nuuvera, their undisclosed personal stakes in Nuuvera raise questions around the potential for conflicts of interest."

165.    In response to the *Globe and Mail* article concerning the undisclosed conflicts of interest in the Nuuvera deal, Aphria claimed to take steps to improve its corporate governance. As reported in an April 25, 2018, by *The Globe and Mail* in an article entitled *Aphria announces new policy for corporate governance control*, "The fresh measures come one month after The Globe and Mail reported that six Aphria directors and its CFO personally held stock in newly acquired Nuuvera Inc. Their holdings weren't disclosed to the market until late March when the Nuuvera shares converted into Aphria stock, raising questions over the potential for conflicts of interest."

166.    Therefore, Aphria and the board were aware that Neufeld, Cacciavillani, and Cervini had previously undisclosed interests in transactions entered into by Aphria with the assistance and/or participation of DeFrancesco-related entities just months before these same individuals orchestrated a scheme that included omitting undisclosed interests and conflicts of interesting concerning the LATAM Assets.

167.    Accordingly, at the time Neufeld, Cacciavillani, and Cervini were negotiating and purportedly performing due diligence on the deal, these Defendants knew they were engaging in the same deceptive and fraudulent conduct by not disclosing their interests for yet a second time.

**E.    Repeated Efforts to Conceal DeFrancesco's Involvement in the LATAM Assets Acquisition Supports the Conclusion that Defendants Knowingly Engaged in a Scheme to Defraud Investors.**

168.    As alleged previously, DeFrancesco changed the names of the LATAM Assets entities prior to selling them to Scythian. By doing this, he concealed the integral role he played in the overall transaction.

169.     Aphria and Scythian went to further lengths to conceal his identity from investors. In the agreement to purchase the LATAM Assets, the companies redacted the name of the individual with "knowledge" who was responsible for the representations and warranties as to the value of the LATAM Assets as well as the names of the individuals who had "employment contracts" with ABP, Marigold Projects, and ColCanna.

170.     Below are the excerpts from the purchase agreements showing the redactions described above:

| Section 1.4 | Knowledge. |
| --- | --- |

Where any representation or warranty contained in this Agreement is expressly qualified by reference to the knowledge of the Vendor, it will be deemed to refer to the knowledge of ███████████████████   ████████ and ████████, in each case after due and diligent inquiry of such Person. [NAMES OF INDIVIDUALS WITH KNOWLEDGE]

and

"Employment Contracts" means Contracts, other than Employee Plans, relating to ████████████████ and ███████
[NAMES OF EMPLOYEES]

171.     Additionally, in Scythian's filings with the Canadian Stock Exchange concerning the issuance of Scythian shares to the holders and sellers of MMJ International shares and MMJ Colombia, Scythian redacted the names of the beneficiaries of the deals. Thus, any disclosure of any Scythian shares received by Defendants were concealed so as to not expose the scheme to defraud Aphria's investors.

## F.     Neither DeFrancesco nor Scythian Denied DeFrancesco's Involvement in Orchestrating the Transaction.

172.     Scythian stood by the actions of DeFrancesco in an interview by the current CEO Brady Cobb on Bloomberg Canada. Cobb admitted during the interview that "[DeFrancesco] went to Latina America with a team that was built and acquired these assets . . .  in Argentina . . . there is one license and Aphria now owns that license as a result of this transaction."  Further, in response to question about whether any Aphria insiders benefited from the LATAM Assets acquisition,

74

Cobb responded, in part, "to the extent that people are able to put those deals together to make them happen . . . that's not for free. These aren't charitable organizations."

173.    DeFrancesco also did not deny that he was involved in the transactions. As reported by *Barrons.com*, DeFrancesco confirmed in an interview that "he had assembled the overseas assets that Aphria bought, but noted that the deals had passed fairness valuations by lawyers and investment bankers."

174.    Furthermore, in an interview provided to BNN reporter David George-Cosh, DeFrancesco denied wrongdoing and stated that the sale of the LATAM Assets to Aphria was a success:

> "I got out and I defended what I thought needed to be defended, rightly or wrongly," DeFrancesco said. "All of the reports, from Scotiabank to Cormark, came out verifying the assets, verifying the licenses, verifying even the values albeit at the high end. Great. That means I did my job for SOL shareholders. My job is to sell for the best possible price I can get."

## G.    The "Transition" and "Retirement" of Neufeld and Cacciavillani along with the Stepping Down of Cervini Support a Cogent and Compelling Inference of Scienter

175.    In the wake of the Hindenburg Report, on December 6, 2018, Aphria announced that it was convening a Special Committee to "Review Governance Processes Related to LATAM Acquisition."  Three weeks later on December 27, 2018, Aphria announced that it was appointing an independent Chairman of the Board, Simon Irwin, to take over for Neufeld as "an independent Chair advances the Company's governance best practices."

176.    As the Special Committee's investigation continued to unfold, Aphria announced through the January 11, 2018 Executive Transition Press Release that Neufeld and Cacciavillani would "transition" out of their roles as the CEO and as Vice-President,  Growing Operations, respectively, as they neared the end of their "five-year journey." The January 11, 2018 Executive

Transition Press Release was unequivocal that this "transition" was from their roles as executives only and that Neufeld and Cacciavillani would "remain on the Board."

177.    The January 11, 2018 Executive Transition Press Release purported and inferred that the "transition" was due to a pre-determined event and was likewise the result of Neufeld's and Cacciavillani's age and the demands of their executive positions. This, however, contradicted the previously disclosed terms of Aphria's employment agreements with" Neufeld and Cacciavillani that their employment was "for an indefinite term."

178.    Finally, with the February 15, 2019 Special Committee Press Release Aphria announced the summary of the Special Committee's investigation, that Neufeld and Cacciavillani "will be retiring from the Company (including in their capacity as directors)," and that Cervini would "step down" from the Board and would no longer serve an executive. Notably, these departures were announced in conjunction with the Special Committee's finding that "certain of the non-independent directors of the Company had conflicting interests in the Acquisition that were not fully disclosed to the Board."

179.    Although the February 15, 2019 Special Committee Press Release did not disclose who were the non-independent members of the Board, each of Neufeld, Cacciavillani, and Cervini were considered non-independent by Aphria and were the non-independent directors at issue.

180.    Thus, given the conspicuous timing of the announcements of the "transition" of Neufeld and Cacciavillani from their executive roles and the unexpected announcement of the "retirement" of Neufeld and Cacciavillani from the Board as well as the departure of Cervini from the Board and as an executive along with undisclosed "conflicting interests in the Acquisition" this supports a cogent and compelling inference of scienter that Neufeld, Cacciavillani, and Cervin each knew that the value of the LATAM Assets was not commensurate with what they and Aphria

represented during the Class Period, that they knew of their undisclosed "conflicting interests," and they knew about and participated in the scheme to defraud Aphria's investors.

## H.   Ownership Interests of Parties

181.   At the time of the issuance of the July 17, 2018 Press release, Neufeld, Cacciavillani, Cervini, and Renah Persofsky, an Aphria director, held an aggregate of 20,496 shares and 215,887 warrants of Scythian, representing approximately 2.1% of Scythian. These individuals, therefore, had a disclosed interest stake in the positive outcome to Scythian and its stock price.

## I.   Corporate Scienter

182.   The falsity of the statements identified herein is so egregious that Aphria would have been deliberately reckless had it not known of the true value of the LATAM Assets. Accordingly, Aphria acted with scienter under the corporate scienter doctrine.

183.   Aphria is liable for the acts of the Individual Defendants and its other employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

184.   The scienter of the Individual Defendants and other employees and agents of Aphria is similarly imputed to Aphria under *respondeat superior* and common law agency principles.

## LOSS CAUSATION AND ECONOMIC LOSS

185.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Aphria's securities, and operated as a fraud or deceit on acquirers of Aphria securities. As detailed above, when the truth about the scheme to defraud, the value of the LATAM Assets, and the undisclosed conflicts of interest by the Aphria insiders was revealed, the value of Aphria securities declined

precipitously as the prior artificial inflation no longer propped up its securities prices. The decline in Aphria's securities price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by the Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Aphria - specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Aphria's securities price and the subsequent significant decline in the value of Aphria's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

186.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the value of the LATAM Assets and the conflicts of interest by the Aphria insiders, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Aphria securities to be artificially inflated. Plaintiffs and other Class members purchased Aphria's securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

187.    Aphria's stock price fell in response to the corrective news issued on December 3, 2018, as alleged *supra*. Before the market opened on December 3, 2018, Hindenburg and QCM issued a report disclosing information that was directly related to and partially correcting Defendants' prior misrepresentations and material omissions concerning the value of the LATAM

Assets, material omissions concerning the transaction including the undisclosed conflict of interest by the non-independent members of Aprhia's Board, and the scheme to defraud Aphria investors.

188.   More specifically, as discussed *supra*, before the market opened on Friday, December 3, 2018, Hindenburg and QCM published the Hindenburg Report that discussed significant issues concerning Aphria's acquisitions of the LATAM Assets, including that the value of the LATAM Assets was significantly less then represented by Aphria, that the transaction was result of relationships of Aphria insiders with DeFrancesco that would benefit undisclosed insiders, a scheme to defraud Aphria's investors. The information disclosed in the Hindenburg Report and the information disclosed later that day in the QCM Presentation partially corrected Defendants misrepresentations and material omissions during the Class Period.

189.   In response, Aphria's securities prices decreased as investors and the market considered the Hindenburg Report and QCM Presentation as well as Aphria's responses and various analyst reports. The market responded quickly and decisively in response to this news entering the market and partially correcting Defendants misstatements and omissions. The information disclosed in the Hindenburg Report and QCM Presentation caused the price of Aphria stock to decrease significantly. From a closing price of $7.90 per share on November 30, 2018, Aphria's stock plummeted to $4.51 per share on December 4, 2018 representing a total market capitalization loss of more than $220 million.

190.   Aphria's stock price also fell in response to the corrective news issued on April 15, 2019, as alleged *supra*. Before the market opened on April 15, 2019, Aphria issued a press release and filed a Form 6-K with the SEC that included its third fiscal quarter results and management's discussion and analysis for the quarter that disclosed information that was directly related to and partially correcting Defendants' prior misrepresentations and material omissions concerning the

value of the LATAM Assets by announcing impairments and also lowering the "fair value" of the licenses, permits & application it received in the Acquisition.

191.    More specifically, as discussed *supra*, before the market opened on Friday, April 15, 2019,  Aprhia issued the April 15, 2019 Press Release, the 3Q2019 Form 6-K that included the 3Q2019 Financial Statements and 3Q2019 MD&A.  Each of the documents discussed significant issues concerning Aphria's acquisitions of the LATAM Assets, including that the LATAM Assets was worth significantly less than represented by Aphria and as such Aphria was recording an impairment of C$50 million on the LATAM Assets, and was revaluing LATAM Assets's licenses, permits, & applications from C$191,066,000 to C$123,956,000, a reduction equal to C$67,110,000 or a decrease of 35.12%. The information contained the April 15, 2019 Press Release, the 3Q2019 Form 6-K (including the 3Q2019 Financial Statements and 3Q2019 MD&A) disclosed partially corrected Defendants misrepresentations and material omissions during the Class Period.

192.    In response to this news, the market responded quickly and decisively. The information disclosed on April 15, 2019 caused the price of Aphria stock to decrease significantly. From a closing price of $10.10 per share on April 12, 2019, Aphria's stock dropped to $8.60 per share the following trading day on April 15, 2019 amounting to an additional $97.5 million market capitalization loss.

193.    On April 15, 2018, *BNN Bloomberg* published an article entitled *Aphria swings to loss in spite of 617% third-quarter revenue surge* that noted the impairment drove Aphria's losses for the quarter as a result of the impairment. In an interview with BNN Bloomberg, Aphria's Irwin Simon played down the writedown by stating "I think the most important thing is what we ultimately grow it into is not what the valuations are, or what's on the books,[.]" An article on

Bloomberg.com published the same announced that *Aphria Falls Most Since December on Writedown, Revenue Miss* and stated that "Aphria Inc. slid as much as 16 percent Monday, the most since early December when the cannabis company was under attack by short-sellers, after reporting a writedown and revenue that missed expectations."

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

194.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

      (a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      (b)    the omissions and misrepresentations were material;

      (c)    Aphria's stock traded in an efficient market;

      (d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

      (e)    Plaintiffs and other members of the Class purchased Aphria securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

195.    At all relevant times, the markets for Aphria securities were efficient for the following reasons, among others:

      (a)    as a regulated issuer, Aphria filed periodic public reports with the SEC and with Canadian securities regulators;

      (b)    Aphria regularly communicated with public investors via established market communication mechanisms, including through regular

disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)   Aphria was followed by several securities analysts employed by major brokerage firm(s), including Canaccord Genuity, Cormark Securities, Clarus Securities, Inc., GMP Securities Inc., Haywood Securities, Inc., P I Financial, Scotiabank, Seaport Global Securities, and VIII Capital, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)   Aphria securities was actively traded in an efficient market, namely the NYSE, under the ticker symbol "APHA."

196.   As a result of the foregoing, the market for Aphria securities promptly digested current information regarding Prothena from publicly available sources and reflected such information in Aphria securities.  Under these circumstances, all purchasers of Aphria securities during the Class Period suffered similar injury through their purchase of Aphria securities at artificially inflated prices and the presumption of reliance applies.

197.   Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## NO SAFE HARBOR

198.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Aphria who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

199.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased during the Class Period: (i) Aphria common stock on the OTC market from U.S.-based market makers; (ii) Aphria common stock on the NYSE; or (iii) Aphria securities transacted on U.S.-based exchanges; and were damaged thereby.  Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Aphria or Scythian, and the directors and officers of Aphria and Scythian and their families and affiliates at all relevant times.

200.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

201.   There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether the Exchange Act was violated by Defendants;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)   Whether the price of Aphria securities were artificially inflated; and

(f)   The extent of damage sustained by Class members and the appropriate measure of damages.

202.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

203.   Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiffs have no interests that conflict with those of the Class.

204.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### Against the Defendants

205.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

206.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

207.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

208.   Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Aphria securities; and (iii) cause Plaintiffs and the other Class members to purchase or otherwise acquire Aphria securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

209.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Aphria securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Aphria's operations and acquisitions.

210.    Defendants committed the acts and omissions alleged herein willfully or with reckless disregard for the truth.

211.    Information showing that Aphria and the Individual Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Defendants' knowledge and control.

212.    In ignorance of the adverse facts concerning Aphria's operations and acquisitions which were concealed by Defendants, Plaintiffs and the other Class members purchased or otherwise acquired Aphria securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

213.    Had Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.

214.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

215.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases of Aphria securities during the Class Period.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

216.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

217.    During the Class Period, the Individual Defendants participated in the operation and management of Aphria, and conducted and participated, directly and indirectly, in the conduct of Aphria's business affairs. Because of their senior positions, they knew the adverse non-public information about Aphria's misstatements and omissions concerning the LATAM Assets.

218.    As officers, directors, significant shareholders, and/or advisors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Aphria's operations and acquisitions, and to correct promptly any public statements issued by Aphria which had become materially false or misleading.

219.    Because of their positions of control and authority as officers, directors, significant shareholders, and/or advisors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Aphria disseminated in the marketplace during the Class Period concerning Aphria's operations and acquisitions. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Aphria to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Aphria within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aphria securities.

220.    Each of the Individual Defendants, therefore, acted as a controlling person of Aphria. By reason of their roles as officers, directors, significant shareholders, and/or advisors of Aphria, each of the Individual Defendants had the power to direct the actions of, and exercised the

87

same to cause, Aphria to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Aphria and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other Class members complain.

221.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aphria.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Classes herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiffs as the designated Class representatives and Plaintiffs' counsel designated as Class Counsel;

B.    Plaintiffs and the members of the Classes recover damages sustained by them, as provided by law, and that a judgment in favor of Plaintiffs be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

C.    Plaintiffs and members of the Classes be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

D.    Plaintiffs and members of the Classes recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

E.    Plaintiffs and members of the Classes receive such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: May 28, 2019

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

s/ Adam M. Apton
_____

Nicholas I. Porritt
Adam M. Apton
55 Broadway, 10th Floor
New York, New York 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: nporritt@zlk.com
Email: aapton@zlk.com

Alexander A. Krot III
1101 30th Street, NW
Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: akrot@zlk.com
(*pro hac vice* to be submitted)

*Attorneys for Lead Plaintiff Shawn P. Cunix*
*and Plaintiff Elizabeth Alexander and*
*Counsel for the Proposed Class*