UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :

                        :               <u>MEMORANDUM DECISION</u>

IN RE APHRIA, INC. SECURITIES LITIGATION  :                <u>AND ORDER</u>

                        :            18 Civ. 11376 (GBD)

                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

GEORGE B. DANIELS, United States District Judge:

Lead Plaintiffs Shawn Cunix and Elizabeth Alexander bring this action against Defendants

Aphria Inc. ("Aphria"); Victor Neufeld; Carl Merton; Cole Cacciavillani; John Cervini; Andrew

DeFrancesco; (collectively, the "Individual Defendants" but with Aphria, the "Aphria

Defendants"); and SOL Global Investments Corp., formerly known as Scythian Biosciences Corp.

("Scythian"), asserting claims under Section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule

10b-5(b), 17 C.F.R. § 240.10b-5(b), as well as Section 20(a). (*See* Am. Compl. for Violation of

the Fed. Security Laws ("AC"), ECF No. 81.)

Plaintiffs move to strike portions of the Aphria Defendants' motions to dismiss or convert

their motion into one for summary judgment. (Pls.' Mem. of Law in Supp. Of Their Mot. To Strike

and/or Convert, ECF No. 123.) Plaintiffs' motion to strike and/or convert is DENIED.[1]

---

[1] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the
complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be
taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on
in bringing suit.'" *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am.
Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). Courts are also permitted to consider legally required
public disclosure documents filed with the SEC on a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar
Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). This Court does not consider material other than what it has
listed above. Moreover, Plaintiffs' motion to strike is improper. None of the rules cited by Plaintiff
confer authority on a party to move to strike portions of an opposing party's motion to dismiss. The only
rule that contemplates a motion brought by a party, Rule 12(f), provides that a court "may strike from a

Defendants Neufeld, Merton, and Aphria move to dismiss the AC pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA").  (Notice of Mot., ECF No. 110.)  This motion to dismiss is DENIED.

Defendants Cacciavillani and Cervini move to dismiss the AC pursuant to Rule 12(b)(2). (Notice of Mot., ECF No. 110.)  Defendants Cacciavillani and Cervini's motion to dismiss for lack of personal jurisdiction is GRANTED.  Defendant DeFrancesco moves to dismiss Plaintiffs' AC pursuant to Rules 9(b) and 12(b)(6), and the PSLRA.  (*See* Notice of Mot. to Dismiss, ECF No. 108.)  Defendant DeFrancesco's motion to dismiss is GRANTED.

## I.    FACTUAL BACKGROUND

### A. Lead Plaintiffs.

Lead Plaintiffs Cunix and Alexander brought this class action on behalf of all persons or entities that purchased Aphria securities between July 17, 2018 and April 12, 2019 (the "Class Period").  (AC ¶ 1.)  Plaintiff Cunix purchased Aphria securities on the New York Stock Exchange ("NYSE") during the Class Period.  (AC ¶ 18.)  Plaintiff Alexander purchased all of her Aphria stock between September 6, 2018 and October 5, 2018, (*see* Decl. of Elizabeth Alexander ("Alexander Decl."), Ex. A (Aphria Trades), ECF No. 121), when it was only traded on the Toronto Stock Exchange ("TSX"), (AC ¶ 20.)  Some of the purchases were made through U.S.-based market makers.  (*See* Alexander Decl.; Decl. of Adam M. Apton ("Apton Decl."), ECF No. 120, ¶ 4.)[2]

---

*pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added). Rule 12(f) does not apply to motions to dismiss.

[2] Defendants Neufeld, Merton, Cacciavillani, John Cervini, and Aphria argue that Plaintiff Alexander lacks standing to bring claims in this suit. This Court will not address this issue at this stage of the case.

**B. The Defendants.**

Aphria is a cannabis company based in Ontario, Canada that produces and sells cannabis products where it is legal to do so. (AC ¶¶ 2, 20.) Aphria's stock began trading on the TSX in July 2018 and on the NYSE since November 2, 2018. (AC ¶ 20.)

SOL, formerly known as Scythian, is a life sciences company with a focus on cannabis. (AC ¶ 27.) SOL is based in Toronto, Canada and maintains offices and business operations in Florida. (*Id.*) Aphria and various Aphria insiders, including Neufeld, Cacciavillani, and Cervini, owned approximately 10% of Scythian during the Class Period. (*Id.*)

Defendant DeFrancesco has been Chairman of SOL and serving on its Board of Directors since September 2018. (AC ¶ 28.) He is a co-founder of Aphria and has served as a strategic advisor to Aphria Defendants Neufeld, Cacciavillani, and Cervini. (AC ¶ 25.) He has invested or advised on Aphria's equity financing since it went public. (*Id.*) DeFrancesco owned 5.6% of Aphria's stock in 2014. (*Id.*) He was involved in the sale of the Latin American assets by Scythian to Aphria. (AC ¶ 173.) DeFrancesco has a private equity firm, the Delavaco Group. (*See* AC ¶ 25.)

Defendant Neufeld was Aphria's President and CEO from June 2014 to March 2019 and Chairman from June 2014 to December 26, 2018. (AC ¶ 21.) He served on Scythian's Board of Directors from January 15, 2018 to April 24, 2018. (*See* AC ¶¶ 21, 154.)

Defendant Merton has been Aphria's CFO since December 2015. (AC ¶ 22.) Along with Neufeld, he filed certifications attesting to the accuracy of a series of Aphria's financial statements. (AC ¶¶ 124, 140, 146.)

Defendant Cacciavillani is a co-founder of Aphria. (AC ¶ 23.) He served as a vice president and a director on its Board of Directors during the Class Period until March 1, 2019. (*Id.*)

Defendant Cervini is a co-founder of Aphria. (AC ¶ 24.) He served as a vice president and a director on its Board of Directors during the Class Period until March 1, 2019. (*Id.*)

Both Cacciavillani and Cervini reside in Canada. (Decl. of Jason C. Hegt ("Hegt Decl."), Ex. 10 (Annual Information Form), ECF No. 112, at 47.) They signed three of Aphria's periodic reports filed with the Ontario Securities Commission. (*See* AC ¶¶ 121, 129, 140.) Aphria subsequently appended these documents to various filings with the SEC in the U.S.; neither Cacciavillani nor Cervini signed those filings. (*See* Hegt Decl., Ex. 11 (Form 40-F), Ex. 12 (July 31, 2018 Financial Statements), Ex. 13 (October 12, 2018 Financial Statements), Ex. 14 (Form 6-K), Ex. 15 (January 11, 2019 Financial Statements).) The last of the three reports was Aphria's financial statements for the second quarter of 2019, which Aphria filed with the SEC two months after it registered with the SEC and began trading on the NYSE. (*See* AC ¶¶ 20, 140.)

## C. Aphria's Acquisition of the LATAM Assets

Aphria acquired a series of Latin American assets from Scythian. (AC ¶ 126.) These assets primarily consisted of three entities: (1) Marigold Acquisitions Inc. ("Marigold") in Jamaica; (2) MMJ International Investments Inc. ("MMJ International"), which owned ABP, S.A. ("ABP"), in Argentina; and (3) MMJ Colombia Partners Inc. ("MMJ Colombia"), which owned 90% of ColCanna SAS ("ColCanna"), in Colombia (collectively, the "LATAM Assets"). (*Id.* ¶ 3.)

Defendant DeFrancesco and other Aphria insiders were the initial owners of the LATAM Assets. (*Id.* ¶ 36.) The LATAM Assets were first acquired by entities set up, acquired, or both, by DeFrancesco, (*Id.* ¶ 78), and these entities all had "Delavaco" in their names. (*Id.* ¶¶ 38, 41, 44.) Prior to Scythian's acquisition of the underlying assets, DeFrancesco changed the names of the entities to Marigold Acquisitions Inc., MMJ International Investments Inc., and MMJ Colombia Partners Inc., respectively. (*Id.*) Between March 11, 2018 and April 8, 2018, Scythian

purchased Marigold for approximately C$34.5 million,[3] ABP for approximately C$27 million, and ColCanna for approximately C$39 million. (*Id.* ¶¶ 37, 40, 43.) Three months later, Scythian announced it would be selling the LATAM Assets to Aphria. (*Id.* ¶ 113.)

Prior to agreeing to purchase the LATAM Assets, Aphria had access to the financial statements, licenses, and financial forecasts of LATAM Assets. (*See id.* ¶¶ 158–60.) Neufeld, Merton, Cacciavillani, "and other insiders" conducted site visits of the LATAM Assets operations and met with local representatives. (*Id.* ¶¶ 138, 161.) In June 2018, Defendants Neufeld and Cacciavillani traveled to Colombia to meet with ColCanna's management and visit its field operations. (*Id.* ¶ 161.) In July 2018, Defendant Merton traveled to Jamaica to inspect Marigold's operations. (*Id.*)

On July 17, 2018, Aphria announced in a press release its plan to purchase the LATAM Assets from Scythian. (Hegt Decl., Ex. 2 (July 17, 2018 Press Release) ("Press Release"), at 1.) This press release disclosed that certain Aphria insiders, including Neufeld, Cacciavillani, and Cervini, held interests in the LATAM Assets, that Neufeld had previously served on Scythian's Board of Directors, and that these individuals all recused themselves from the discussion and voting regarding this acquisition. (Press Release at 3.) In this press release, Aphria stated, among other things, that this transaction "[p]rovides Aphria with world class assets," that Aphria "[g]ains first mover advantage in Argentina," and that ABP, S.A. "is an established and successful" company. (*Id.* at 1.)

On September 27, 2018, Aphria announced that it completed the acquisition of the LATAM Assets. (AC ¶ 126.) It paid Scythian by assuming $1 million of debt associated with the LATAM Assets and transferring to Scythian 15,678,310 shares of Aphria stock. (*Id.*) On that day, Aphria's

---

[3] To differentiate, "C$" denotes Canadian dollars and "$" donates U.S. dollars.

stock traded at $13.64 per share, increasing from $7.94 per share on July 17, 2018. (*Id.* ¶ 128.) Aphria also stated that it "acquir[ed] industry-leading cannabis-related companies." (*Id.*) It, again, referred to ABP, S.A. as an "established and successful pharmaceutical import and distribution company." (*Id.*)

### D. The Hindenburg Report

On December 3, 2018, Hindenburg Research ("Hindenburg") and Quintessential Capital Management ("QCM"), two investment research firms, published a report (the "Hindenburg Report") detailing suspected fraud by Aphria and executives related to the LATAM Assets. (*Id.* ¶¶ 9, 75.) It asserted that the LATAM assets were not as represented by Aphria, that Aphria grossly overpaid for the LATAM Assets and that the transaction had undisclosed conflicts of interest and undisclosed related-party transactions. (*Id.* ¶ 75; Hegt Decl., Ex. 3 (*Aphria: A Shell Game with a Cannabis Business on the Side*) ("Hindenburg Report"), at 4, 18.) The author(s) of the Hindenburg Report disclosed that they possessed a short interest in Aphria's stock and that Hindenburg stood to profit from a decline in its price. (Hindenburg Report at 38–39.) The Report was successful in promoting a sharp decline in the price of Aphria's stock. (*See* ¶ 80.)

On the same day, Aphria denied the Hindenburg Report's allegations, (*Id.* ¶ 83.), and the four Aphria Individual Defendants all purchased additional Aphria stock to indicate their confidence in the company, (Hegt Decl., Ex. 4 (Neufeld SEDI Report), at 3; *Id.*, Ex. 5 (Merton SEDI Report), at 2; *Id.*, Ex. 6 (Cervini SEDI Report), at 4; Ex. 7 (Cacciavillani SEDI Report), at 4 (collectively, "SEDI Reports").) All four Aphria Individual Defendants held more equity in Aphria at the end of the Class Period than at the beginning. (*See* SEDI Reports.) None of the Aphria Individual Defendants sold Aphria stock during the Class Period. (*See id.*)

On January 5, 2019, *Bloomberg* published an article highlighting the flaws in the Hindenburg Report. (*See* Hegt Decl., Ex. 8 (*This Jamaica Weed Farm Is Thriving, Despite Short Sellers' Doubts*) ("Bloomberg Article").)

### E. Special Committee Review and Impairment

On December 6, 2018, Aphria announced that it was creating a Special Committee to review the allegations in the Hindenburg Report. (AC ¶ 92.) On January 11, 2019, Aphria reported financial results for the second quarter of 2019, listing the estimated fair value of the LATAM Assets as C$191,066,000. (*Id.* ¶ 142.) It also explained that the value was "preliminary" and "may be subject to adjustments pending . . . final valuations." (*Id.* ¶ 141.) Defendants Neufeld and Merton certified these financial results. (Id. ¶ 140.)

On February 15, 2019, Aphria's Special Committee concluded that the price paid for the LATAM Assets was within an acceptable range despite near the top of the range. (*Id.* ¶ 97.) It further announced that "certain of the non-independent directors of the Company had conflicting interests in the Acquisition that were not fully disclosed to the Board." (*Id.* ¶ 98.) On the same day, Aphria announced that Neufeld and Cacciavillani would be retiring from Aphria and that Cervini would step down from the Board. (*Id.* ¶ 178.) Irwin Simon, Aphria's current CEO, confirmed that the results of the internal investigation "called for" their resignations. (*See* Apton Decl., Ex. A (Transcription of Interview with Irwin Simon) ("Simon Interview"), ECF No. 120, at 3.)

On April 15, 2019, Aphria announced it was taking a C$50 million impairment charge on the LATAM Assets as a result of an impairment test requested by the Ontario Securities Commission. (*Id.* ¶ 100–101.) Aphria explained this impairment was based on "new" and "recent" financial information" about the assets' operations and projections. (*Id.* ¶ 101.) On the same day,

Aphria issued its financial statements for the third quarter of 2019, reducing the value of the LATAM Assets by C$67,111,000 (from C$191,066,000 to C$123,956,000), or 35.12%. (*Id.* ¶ 104.)

## F.  The LATAM Assets

### a.  Marigold

On July 17, 2018, Aphria reported that Marigold was a Jamaican company with "several key licenses," including one "Tier 3 license" and additional "conditional" licenses. (AC ¶ 113.) The Hindenburg Report claimed that Marigold's licenses were obtainable at a cost of $500. (AC ¶ 87.)  In September 2018, Marigold's office located at 28 Lancaster Road in Kingston, Jamaica was without any sign of operations. (AC ¶ 47.) On May 24, 2019, additional investigation showed that the building was empty or under repair, and not occupied by Aphria. (AC ¶ 48.) Corporate records showed that Marigold had other business locations, but they either did not exist or were confirmed in person not to be operational. (AC ¶¶ 50–54.) On December 4, 2018, Aphria stated that Marigold was "fully operational" and had harvested 2,500 kg of cannabis. (AC ¶ 138.)

### b.  MMJ International (ABP)

On July 17, 2018, Aphria reported that ABP was "an established and successful pharmaceutical import and distribution company." (AC ¶ 113.)  It further reported that ABP "partnered" with Hospital Garrahan, a leading pediatric hospital in Buenos Aires. (*Id.*) Hospital Garrahan confirmed that Aphria donated cannabis to the hospital for research purposes. (AC ¶ 116.)  In July 2018 and September 2018, Aphria reported that ABP operated "a pharmaceutical distribution warehouse and retail pharmacy" that distributed to "an extensive network." (AC ¶¶ 113, 126.)  Two site visits of ABP in October 2018 and May 2019 found that it consisted of a retail drugstore and a warehouse facility with little activity or branding. (AC ¶¶ 59–

62.)  Aphria reported that ABP had the potential for in-country cultivation if Argentina approved medical cannabis.  (AC ¶¶ 122, 130, 144.)

### c.  MMJ Colombia (ColCanna)

On July 17, 2018, Aphria reported that ColCanna was in the "advanced licensing stages" for a cannabis license.  (AC ¶ 113.)  It further reported that ColCanna sat on 34 acres of "highly fertile, predominately flat land," that "greenhouses will occupy more than 20 acres of the property," and that ColCanna was "expected to achieve an initial annualized production of 30,000 kg, growing to 50,000 kgs" of cannabis.  (AC ¶ 113.)  Aphria also cautioned investors that "expectations with respect to actual production volumes [and] expectations for future growing capacity and costs" were forward-looking statements that might differ materially from actual results.  (Press Release at 3–4.)  On October 12, 2018, Neufeld stated in a conference call that construction in Colombia was underway, noting that "[t]he facility continues its greenhouse build." (AC ¶ 135.)

As of April 8, 2018, ColCanna did not have any cannabis licenses or land to use for cultivation.  (*See* AC ¶¶ 43, 69.)  At the time of the acquisition, ColCanna's greenhouses were not yet operational.  (*See* ¶ 68.)  ColCanna was not authorized to produce any cannabis during 2018 or 2019 because it did not have "quota" from the Colombian government.  (AC ¶ 117.)

## II.    LEGAL STANDARDS

### A. Rule 12(b)(2) Lack of Personal Jurisdiction.

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff has the burden of making a prima facie showing that personal jurisdiction over the defendant exists, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012); *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y.

2014) (plaintiff bears the burden of establishing personal jurisdiction on a motion to dismiss for lack of personal jurisdiction).  In assessing personal jurisdiction on a Rule 12(b)(2) motion, the court is neither required to "draw argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (citation omitted), nor must it "accept as true a legal conclusion couched as a factual allegation." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (citation omitted).

A court cannot exercise personal jurisdiction over a defendant unless doing so comports with constitutional due process principles. *Licci*, 673 F.3d at 60.  The due process analysis consists of two discrete components; "the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).  Under the minimum contacts inquiry, the court "must determine whether the defendant has sufficient minimum contacts with the forum ... to justify the court's exercise of personal jurisdiction." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Once the court is satisfied that a defendant has sufficient contacts with the forum to justify the court's exercise of personal jurisdiction, it must then determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloé*, 616 F.3d at 164 (quoting *Int'l Shoe*, 326 U.S. at 316).  If the court determines that a defendant lacks the requisite contacts, it need not consider the second prong of the due process test to determine whether the exercise of jurisdiction is reasonable under the particular circumstances of the case. *See Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568–69 (2d Cir. 1996) (quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)).

For purposes of the minimum contacts analysis, a distinction is made between general and specific jurisdiction. In most instances, general jurisdiction may be exercised only where the defendant's "affiliations with the [forum] . . . 'are so constant and pervasive as to render it essentially at home in the forum.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). By contrast, the exercise of specific jurisdiction "depends on an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citations omitted); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) (discussing general versus specific jurisdiction).

### B. Rule 12(b)(6) Failure to State a Claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).[4]

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*,

---

[4] In deciding a motion to dismiss under Rule 12(b)(6), a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at \*3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

### C. Rule 9(b) Heightened Pleading Standard and the PSLRA.

Allegations of fraud, including securities fraud, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b). *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under Rule 9(b), a complaint alleging securities fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In particular, "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Additionally, the PSLRA expands upon Rule 9(b) by requiring the plaintiff to "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation omitted).

**D. Section 10(b) of the Securities Exchange Act of 1934 and Corresponding Rule 10b-5(b).**

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Under Rule 10b-5(b), it is unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5. Thus, to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

"Under Section 10(b) and Rule 10b-5, the required state of mind is 'scienter,' or an intent 'to deceive, manipulate, or defraud.'" *First N.Y. Sec. LLC v. United Rentals Inc.*, 391 F. App'x 71, 73 (2d Cir. 2010) (quoting *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). "The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 556 (2d Cir. 2018) (quoting *ECA v. JP Morgan Chase Co.*, 533 F.3d 187, 198 (2d Cir. 2009)). Under the "conscious misbehavior or recklessness" prong, to qualify as "strong," the inference of scienter from the facts alleged "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "At least four circumstances may give rise to a strong inference of the requisite scienter:

13

where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *ECA*, 553 F.3d at 199 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000)).

### E. Section 20(a) of the Securities Exchange Act of 1934.

Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person" directly liable under the Exchange Act. 15 U.S.C. § 78t(a). To establish a *prima facie* case of control person liability pursuant to Section 20(a), a plaintiff must sufficiently allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108). Further, a plaintiff must demonstrate primary liability under Section 10(b) prior to making out a control person liability claim. *See Rombach*, 355 F.3d at 177–78 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, [plaintiffs' control person liability claims] must also be dismissed."). "[A] determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

### III.   THIS COURT LACKS PERSONAL JURISDICTION OVER CERVINI AND CACCIAVILLANI

Plaintiffs contend that this Court may exercise personal jurisdiction over Defendants Cervini and Cacciavillani, foreign directors of a Canadian company, because they "signed" certain

Canadian financial statements that Aphria subsequently attached as exhibits to its filings with the SEC.   (AC ¶¶ 121, 129, 140.)   Cervini and Cacciavillani signed two of the three financial statements for filing in Canada prior to Aphria attaching them to its SEC filings.   (AC ¶¶ 121, 129.)

Plaintiffs have not alleged any facts giving rise to general jurisdiction.  Likewise, Plaintiffs' assertions, without more, do not sufficiently establish a basis for this Court to exercise specific personal jurisdiction.[5]  Plaintiffs allegations are insufficient for this Court to infer that Cervini and Cacciavillani purposefully availed themselves of the privilege of conducting activities within the United States.  Plaintiffs have not alleged facts demonstrating that these Canadian residents knew, anticipated or intended that the financial statements they signed would be attached to Aphria's SEC filings in the United States.  Indeed, Defendants' only alleged connection with the United States is Aphria's decision to attach the Canadian financial statements to its filings in the United States; United States filings Cervini and Cacciavillani are not alleged as having certified. Therefore, the AC should be dismissed as to Defendants Cervini and Cacciavillani for lack of personal jurisdiction.

## IV.   PLAINTIFF STATES A CLAIM FOR SECURITIES FRAUD AS TO APHRIA, NEUFELD AND MERTON

Defendants Aphria, Neufeld, and Merton (the "Remaining Aphria Defendants") argue that Plaintiffs have failed to state a securities fraud claim because they have not alleged actionable misrepresentations or scienter under the PSLRA.

### A. Misrepresentations

Plaintiff contends that the Remaining Aphria Defendants made misrepresentations regarding the operational status, condition, and value of the LATAM assets.  In its July 17, 2018

---

[5] To the extent Plaintiffs allege personal jurisdiction over Cervini and Cacciavillani based on Aphria and Scythian's U.S. activities, it is likewise, insufficient.  (AC ¶ 17.)

press release, when announcing the proposed acquisition between Aphria and Scythian, Aphria declared that the "industry-leading companies" it will acquire "provides Aphria with world class assets," including ABP, S.A. which is an "established and successful pharmaceutical import and distribution company." (AC ¶ 113.) In a December 4, 2018 press release, Aphria stated that "Marigold is fully operational[]." (AC ¶ 138.) Moreover, Aphria included a "preliminary estimated value" of the LATAM assets in its second quarter 2019 financial statements that were certified by Neufeld and Merton and filed with the SEC. (AC ¶ 140.)

Plaintiffs allege that the Remaining Aphria Defendants' statements were false and misleading because Defendants lacked a reasonable basis for these statements and were aware of undisclosed facts tending to seriously undermine the accuracy of the statements. Plaintiff argues that the LATAM assets were underdeveloped and largely inoperable entities, and the Remaining Aphria Defendants had knowledge of this fact at the time Aphria acquired the assets. For example, in September 2018 and May 2019, pictures of various Marigold locations showed what appeared to be abandoned or non-operational buildings without any indicia of ongoing business. (AC ¶¶ 47–49.) Indeed, interviews with neighboring tenants at certain locations revealed that these locations had not been occupied for some time. (AC ¶¶ 46–57.) Plaintiffs further contend that ColCanna's corporate revenue records showed zero operating activity, citing an October 2018 revenue record. (AC ¶ 65.) Plaintiff argues that the Remaining Aphria Defendants knew these facts at the time it acquired the LATAM assets principally because the Remaining Aphria Defendants conducted due diligence, including performing various site visits and exchange of

internal data for the LATAM assets, including financial statements. Yet, the Remaining Aphria

Defendants continued to misrepresent and incorrectly value the assets.

The Remaining Aphria Defendants contend that their statements are mere puffery or

corporate optimism. While statements of puffery or optimism are often not actionable, a

reasonable investor would understand that an asset being touted as "world class" or repeatedly

referenced as "established and successful," for example, is an asset that is, at a minimum,

operational. *See Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y.

2014). Even assuming that the Defendants' statements included puffery or corporate optimism,

when viewed in context, a reasonable investor could rely on their statements. Plainly, such facts,

if known to a reasonable investor, would likely influence one's view of the Company's

representations as to operations and conditions of these assets, the company's valuations of the

same, and the decision as to whether to purchase or sell Aphria's securities. *See, e.g., Galestan v.*

*OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018); *In re Complete Mgmt. Inc.*

*Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001); *In re Salix Pharm., Ltd.*, No. 14 Civ. 8925

(KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016).

The Remaining Aphria Defendants also argue that Plaintiffs do not "offer[]allegations of

how the Aphria Defendants should have known based on all available data that they had formed

the wrong opinions about the value of the assets." (Aphria Defs. Mem. of Law in Further Supp.

Of Their Mot. To Dismiss, ECF No. 130, at 7.) Plaintiffs, however, have sufficiently alleged facts

giving rise to a strong inference that the Aphria Defendants knew the true nature of the condition

of the LATAM assets, that Defendant Neufeld was among the directors with an interest in the

LATAM assets, and that Neufeld served as a director on the board of Scythian during the time that Scythian acquired the assets from DeFrancesco.

Having determined that at least some of the Aphria Defendants' statements regarding the operational status and condition of the LATAM assets are actionable, it is unnecessary at this point to consider whether all of Defendants' other alleged misstatements or omissions, including those regarding undisclosed conflicts of interest, are independently actionable.

**B. Scienter**

Plaintiff establishes a strong inference of scienter with respect to the Remaining Aphria Defendants. Prior to completing the acquisition, Neufeld and Merton conducted site visits of the LATAM assets, meeting with "local authorized representatives," and inspecting operations. (AC ¶¶ 138, 161.) Plaintiff also alleges that Aphria "conducted due diligence concerning the LATAM assets" prior to their acquisition and was provided access to the data room, which contained such information as financial statements and forecasts for the LATAM assets. (AC ¶¶ 159–60.) It is at least as compelling an inference that Neufeld and Merton likewise had access to such information given their positions at Aphria. To be sure, Plaintiff "must do more than allege that the [individual defendants] had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions," to establish scienter. *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015). The information at issue, however—the condition of the LATAM assets and whether they were operational—was critical to the acquisition of these assets. Indeed, if after conducting the due diligence and the site visits, it was true that the LATAM assets were in fact valueless assets or sham assets that were not operational, the Remaining Aphria Defendants would have known such crucial information.

Neufeld and Merton's intent may be imputed to Aphria, due to their senior positions within the Company. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017)

("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.")

## V.    PLAINTIFFS DO NOT STATE A CLAIM FOR SECURITIES FRAUD OR CONTROL PERSON LIABILITY AGAINST DEFRANCESCO

Plaintiffs fail to allege that Defendant DeFrancesco made any material misstatements or omissions.  Plaintiffs have put forth a number of alleged misrepresentations and omissions but they attribute none to DeFrancesco.  Indeed, it is difficult to imagine what misstatements or omissions by DeFrancesco, a party on the opposite side of a transaction with Aphria, could warrant reasonable reliance by investors of Aphria.  Consequently, Plaintiffs' claim against DeFrancesco pursuant to Section 10(b) and Rule 10b-5(b) is dismissed.

Likewise, Plaintiffs' AC cannot sustain a Section 20(a) claim for control person liability against Defendant DeFrancesco.  The only facts alleged in support of Plaintiffs' assertion that DeFrancesco exercised control over Aphria are that "DeFrancesco own[ed] 5.6%" of Aphria shares and is a cofounder.  (AC ¶ 4, 25.)  Plaintiffs' factual allegations, even taken as true, do not adequately allege that DeFrancesco was in a position to exercise control over Aphria.  Indeed, DeFrancesco's minimal stockholding belies any notion of DeFrancesco controlling Aphria.  (AC ¶¶ 219–20),

Plaintiffs also assert for the first time in their Omnibus Brief in Opposition to Defendants' Motion to Dismiss that its claim against DeFrancesco under Section 20(a) pertains to Scythian. (ECF No. 119, at 36–38.)  Plaintiffs have failed to plead such a claim in its AC.  Indeed, the AC solely states a claim for control person liability against DeFrancesco for an alleged primary violation by Aphria.  (AC ¶¶ 216–21.)  Nevertheless, even assuming Plaintiffs' AC sets forth such a claim, Plaintiffs have not adequately alleged a primary violation by Scythian.  *See, e.g., In re*

*Bernard L. Madoff Inv. Sec. LLC*, 739 F. App'x 679, 685 (2d Cir. 2018) (noting that the "elements of a § 20(a) claim" include "a primary violation [of the securities laws] by the controlled person"). The AC does not specifically set forth a material misstatement or omission by Scythian and fails to specifically plead how any statements by Scythian were misrepresented and subsequently, relied upon by Plaintiffs.

## VI.    CONCLUSION

Plaintiffs' motion to strike and/or convert, (ECF No. 123), is DENIED.

Defendants Neufeld, Merton, and Aphria's motion to dismiss pursuant to Rules 9(b), 12(b)(6), and the PSLRA, (ECF No. 110), is DENIED.

Defendants Cacciavillani and Cervini's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), (ECF No. 110), is GRANTED.  Defendant DeFrancesco's motion to dismiss pursuant to Rules 9(b), 12(b)(6), and the PSLRA, (ECF No. 108), is GRANTED.

Dated: New York, New York
      September 30, 2020

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge